## THE MUNAIRES.
## THE HORTENSIUS.

(Circuit Court of Appeals, Second Circuit. May 27, 1924.)

No. 302.

**1. Collision &sim;105—Evidence held to warrant finding negligence of both vessels caused collision, resulting in death of seamen.**

Evidence *held* to warrant finding that collision was caused by negligence of both vessels, one in failing to stop when other's course was uncertain, and the other in attempting to pass to starboard after signaling for port to port passing, and that damage to davit, which broke and threw deceased into water, was proximate cause of his death.

**2. Collision &sim;90—Ambrose Channel held "narrow channel," within Inland Rules.**

Ambrose Channel *held* to be "narrow channel," within Inland Rules, art. 25, requiring vessels to keep to side of channel on their starboard side.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Narrow Channel.]

**3. Collision &sim;20—Vessel bound to stop when approaching vessel disregards signals, or in case of uncertainty.**

If vessel is approaching another vessel, which has disregarded her signals or whose position or movements are uncertain, she is bound to stop until her course be definitely ascertained.

Appeal from the District Court of the United States for the Southern District of New York.

A libel was filed by Raymond S. Jackson as administrator, against the British & South American Steam Navigation Company, Limited, owner of the steamship Hortensius and the Munaires Steamship Corporation, owner of the steamship Munaires, for damages for the loss of life of libelant's intestate. A libel was also filed by the British & South American Steam Navigation Company, Limited, against the steamship Munaires for damages sustained by the Hortensius in collision; also a libel filed by the Munaires Steamship Corporation for damages sustained by the Munaires in collision. A decree was entered below, holding both vessels at fault for damages resulting from the loss of life of Donald E. Jackson and for damages to the vessels. Both steamship owners appeal. Affirmed.

Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel), for Jackson.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (W. H. McGrann, of New York City, of counsel), for the Hortensius.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark, of New York City, of counsel), for the Munaires.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. These suits in admiralty were tried together and disposed of in one opinion below. We shall consider them in one opinion here. There are cross-libels by the owners of the respective vessels, which came into collision on the early morning of August 29, 1919, at the outer entrance of Ambrose Channel. Both vessels were substantially damaged, and Jackson, a quartermaster on board the Munaires, was drowned shortly after the collision, while engaged in handling a lifeboat.

The Munaires was 370 feet long, 51 feet beam, a single-screw oil burner, and capable of making 10½ to 11 knots, full speed, when loaded. At the time of collision, her propeller was partly out of water and she was making 8 knots. She was drawing about 8

feet forward and 12 feet aft. Her navigation was then in charge of her master. The Hortensius was 350 feet long, 45 feet beam, was drawing about 14 feet 9 inches aft, and her full speed capacity was about 10 knots, and on the occasion of the collision was making about 9 knots. She was in charge of a Sandy Hook pilot at the time of the collision. The Munaires left the foot of Green street, Brooklyn, light, at 5:35 p. m., August 28, 1919, bound for Newport News. She proceeded to the anchorage grounds off Robins Reef, where some slight repairs were to be made to her telemotor system. After the repairs were made and her system was pronounced to be in good working order, and at about 10:10 p. m., she weighed anchor and started down the bay. Her master was on the bridge, with the third officer and the quartermaster at 'the wheel; a lookout was stationed on the forecastle head. The tide was ebb, the wind southwest, and the weather clear. She proceeded on the starboard side of the Ambrose Channel, passing two inward bound vessels by sufficiently wide margin port to port.

After midnight, when near the second buoy from the outward entrance to the channel on the southerly side, and when close to the buoy, she sighted on her port bow the green light and range lights of the Hortensius. The Munaires slowed her engines and continued on under slow speed, keeping close to the buoys on her starboard side of the channel. The Hortensius sounded one blast about five minutes later, and the Munaires answered with one and ported a little. The Hortensius then shut in her green light and opened up her red, so that the ships were in a position to pass port to port in accordance with the exchange of one-blast passing signals. The Munaires' witnesses testified that then the Hortensius opened up her green light, showing both side lights, and then under a starboard helm shut in her red, showing her green only, indicating an attempt to cross the Munaires' bow and pass starboard to starboard. The Hortensius came on, showing her green light only, and her stem struck the Munaires on the port side, about abreast with the fore rigging. The Munaires' witnesses then say that she immediately put her engines full speed astern, helm hard aport, and sounded three alarm blasts, which indicated that her engines were going full speed astern. The Hortensius' stem cut into the Munaires' forward hold, and she was scraped on the Munaires' port side, tearing off the port gangway ladder and otherwise damaging the vessel. The Hortensius denies that she starboarded her helm and set her course to her left (port) into the Munaires, and argues that circumstances justify her claim of the hard aport helm movement of the Munaires, and not a starboard helm movement of the Hortensius, contending that this fully and logically explains the collision.

[1] To decide correctly the place where the collision occurred does much toward solving the issues here presented. The Sandy Hook pilot, who had complete control of navigating the Hortensius, says he went to the northward of the Whistling Buoy, having it about 200 feet to port, and he then set a course N. W. ½ W. Laying this course down on a chart (with magnetic bearing), it will appear that the Hortensius was steering for the Red Buoy on the north side of Ambrose Channel entrance. This was the proper course. The distance from the Whistling Buoy is approximately 4,500 yards. The Hortensius, going 10 knots or nearly so per hour, would take from 13 to 15 minutes to reach the Red Buoy. The pilot in charge of the navigation of the Hortensius says he saw the lights of the Munaires about abreast Buoy No. 4, which is 3,000 yards inside the Ambrose Channel. The Munaires was going about 8 knots, at which speed it would take over 10 minutes to get out of the Ambrose Channel. The Munaires' green light was always in sight of the Hortensius until the former sheared to her own starboard and exposed her port light to the oncoming Hortensius, when the Hortensius' wheel was put hard aport and signaled full speed astern.

The pilot showed the Munaires on a course which would take her to the Hortensius' starboard side. Such a course would be impossible with the Hortensius on a course N. W. ½ W., because it necessarily puts the Munaires completely outside the Ambrose Channel into the northward of it. This we regard as incorrect and improbable. It is true that the witnesses for the Hortensius explained how the two vessels came together. The diagram showed the Munaires crossing 'the bow of the Hortensius and exposing her port side, but if the Hortensius was pursuing the course as testified, N. W. ½ W. from the Whistling Buoy, the Munaires would not present her port side to the oncoming Hortensius, unless she came in literally from outside Ambrose Channel. We hold that the collision occurred on the southerly side of the channel, close to the White Light Buoy on that side. It is satisfactorily demonstrated that the Munaires was following the chan-

nel course, S. W. ¾ E., and there is no reason to doubt her claim that she was keeping close to the starboard range of lights and on her side of the channel. Concluding, as we do, that the collision occurred on the southerly side of the channel, with the entrance buoy close by on the starboard side, if the Hortensius swung in from her compass course, she would literally hit Buoy 2-a, and go far over to her own port side, and again, if the story of the Hortensius be true, it would reveal the Munaires going down the harbor altogether outside the channel.

[2] The Ambrose Channel is a narrow channel within the terms of article 25 of the Inland Rules. The La Bretagne, 179 Fed. 286, 102 C. C. A. 651. It provides: "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or midchannel which lies on the starboard side of said vessel." Belden v. Chase, 150 U. S. 674, 14 Sup. Ct. 264, 37 L. Ed. 1218; The Gerry (D. C.) 161 Fed. 413.

We regard the Hortensius at fault for starboarding her helm and attempting to pass starboard to starboard, after exchanging one-blast signals to pass port to port. Concededly, the Hortensius blew a one-blast signal to the Munaires 4 or 5 minutes before the collision; that is to say, when the vessels were from 750 to 1,000 feet apart. This was answered by the Munaires. The pilot of the Hortensius says he expected to pass the Munaires starboard to starboard. This explains the Hortensius showing her red light and then opening her green. There was then a failure to port until just before the collision. This delay was manifested by the diagram drawn by the pilot. If the Hortensius had ported in time, there would have been less opportunity for a collision, for it is conceded that the Hortensuis could in a minute and a half swing two or three points. Apparently her porting was when the vessels were near collision. The explanation advanced, that the reason she did not port sooner is that her pilot wrongly assumed that the Munaires was going out to the Narrows and the vessels could pass starboard to starboard, is insufficient. There was no two-blast signal by the Hortensius, indicating a desire to pass the Munaires starboard to starboard, nor were there any other alarm signals to indicate that the Hortensius did not understand the one-blast signal sounded.

[3] Again, we think the Hortensius should have slowed or stopped and reversed her engines before "a few seconds before the collision," when the vessels were one ship's length away or less. It has long been settled that, if a vessel is approaching another vessel which has disregarded her signals, or whose position or movements are uncertain, she is bound to stop until her course be ascertained for a certainty. The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126. A vessel which has signaled by two blasts that she intends passing to starboard instead of to port, and gets no assenting response, is in duty bound to stop, reverse, and, if necessary, come to a standstill, until the course of the other vessel has been ascertained with certainty, and the risk of collision removed. Chamberlain v. Ward, 21 How. 548, 16 L. Ed. 211; Border Line Transp. Co. v. Canadian Pac. Ry. Co. (D. C.) 262 Fed. 989. The officer in charge of the navigation of the Munaires was in doubt for at least ten minutes before the collision as to the navigation of the Hortensius. She did not reduce her speed in time, nor port her helm, but continued on her course for about five minutes. It was the duty of the Munaires' navigator, when so in doubt, to slow or stop and reverse her engines under the circumstances which created the doubt and which then confronted him. The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126; The Albert Dumois, 177 U. S. 240, 20 Sup. Ct. 595, 44 L. Ed. 751; The Portia, 64 Fed. 811, 12 C. C. A. 427.

Jackson was serving as a quartermaster on the Munaires, but when the vessels collided he was stationed at the after davit along with the third assistant engineer, whom he had asked to assist him. The situation appeared serious, and it was expected that the vessel would sink. There was great confusion, and some of the crew became panic stricken and tried to get into or aboard the lifeboat, which was being rigged outboard. It was intended to lower the boat into the water, not merely to swing it out. The deceased and another were standing at the after davit, pushing the stern of the lifeboat overboard, when the upper part of the davit broke off. The upper part of the davit went overboard, striking the assistant engineer, and Jackson and another were thrown into the water, and the lifeboat plunged downward, landing on an even keel. Jackson did not at any time get into the boat, and he was drowned. Holding, as we do, that both vessels are at fault for the collision, and therefore responsible for the damage to the davit, which broke and caused Jackson to

be thrown into the water and drowned, this was the proximate cause of Jackson's death. We see no error in the conclusion arrived at below. The decrees are affirmed.