**MARSHALL FIELD & CO. v. UNITED STATES.**

**No. 247.**

Circuit Court of Appeals, Second Circuit.

March 2, 1931.

The opinion of the District Court was as follows:

Libel against the United States, as owner of the Army Transport Antigone, instituted by cargo owners of the S. S. Gaelic Prince under the enabling Act of March 3, 1927 (Private Law No. 453, 44 Stat. 1808, c. 411), grows out of a collision between the Antigone and the Gaelic Prince on the evening of October 9, 1919, in Ambrose Channel near Buoy No. 10, located at a bend in the channel. The channel is about 2,000 feet wide. There is some disagreement as to the precise scene of the accident in relation to the easterly and westerly limits of the channel. The only witnesses of the collision were the officers and crews of the two ships.

The Antigone was a twin screw steamer of 9,835 tons and about 499 feet in length. The Gaelic Prince was a single screw steamer of 6,506 tons and about 450 feet in length. The Antigone, proceeding from her pier at Hoboken to sea, had entered the channel from the north. The Gaelic Prince was coming into the harbor on a voyage from Far Eastern ports. The vessels sighted one another when the Antigone was somewhere between Buoys No. 13 and 14, and the Gaelic Prince in the vicinity of Buoy No. 8, each vessel at that time proceeding at a speed of from nine and a half to ten knots per hour; they were, then, in different reaches of the channel.

The version of the libelants is in substance as follows: The Antigone was proceeding, when sighted, on her own port side of the channel, the Gaelic Prince at that time being on her own starboard side of the channel. Witnesses on the Gaelic Prince testified to hearing a one-blast signal from the Antigone indicating a port to port passing, at about the time she was sighted near Buoy No. 14. The Gaelic Prince answered with one blast, ported her helm slightly, and slowed her engines to half speed. As the Antigone rounded the bend in the channel at Buoy No. 10, her red and green lights and her range lights became visible on the bridge of the Gaelic Prince, whereupon the Gaelic Prince reaffirmed the previous port to port passing arrangement by again sounding a single blast. The vessels were then about a quarter of a mile apart, both on the easterly side of the channel; that is, the starboard side of the Gaelic Prince. The Antigone then swung to her port suddenly, closing in the red and showing only her green light. The ships being then only two lengths apart, the Gaelic Prince blew a signal of two blasts, hard astarboarded her helm, and went full speed ahead. The Antigone, however, swung to her starboard and collided with the Gaelic Prince, the stem of the Antigone striking the starboard side of the Gaelic Prince just forward of the bridge, and tearing away plates in the way of No. 2 hold.

The version of the respondent contradicts that of libelants' in important particulars. Respondent claims that the Antigone was proceeding on her own starboard side of the channel when the Gaelic Prince was sighted close to the southwesterly bank and on the Antigone's own side of the channel; that the first signal of the Antigone was not a single blast, but two blasts sounded when she was in the vicinity of No. 10; that when the Antigone had steadied on the lower reach on a course parallel to the Staten Island-West Bank range which marks the center of the channel, and on her own starboard side, the Gaelic Prince blew a crossing signal of one blast which the Antigone answered with one blast, directing her course to starboard; that the vessels were then in a position to pass

each other safely port to port, but that the Gaelic Prince suddenly blew two blasts and swung directly across the course of the Antigone; that the Antigone then reversed her engines and blew three blasts on her whistle; and that the Gaelic Prince continued to swing to her port and was then struck on her starboard side by the stem of the Antigone.

The issues involved are simple when abstracted from the mass of conflicting testimony: (1) Was it negligence, under the circumstances, for the Antigone to attempt a starboard to starboard passing? (2) Did she commit a positive breach of duty by her conduct after the Gaelic Prince failed to assent to her signal? (3) Was any initial negligence of the Antigone insulated by subsequent negligence on the part of the Gaelic Prince?

■ Any of three conclusions as to the culpability of the vessels is possible under the conflict of testimony. It could be found that the Antigone was solely at fault, or that the Gaelic Prince was solely at fault, or that the negligence of both vessels contributed to the collision. The last alternative it is not necessary to consider. The present suit is against the owner of the Antigone alone. The Gaelic Prince is not a party. Her cargo stands in a better position than the vessel itself. A vessel libeled by the cargo of an injured vessel is liable to the full amount of the damage, even though, as between the vessels themselves, each is responsible for a moiety of the damage. The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126; The Atlas, 93 U. S. 302, 315, 317, 23 L. Ed. 863; see The Beaconsfield, 158 U. S. 303, 307, 15 S. Ct. 860, 39 L. Ed. 933. And as stated in these cases, the same rule applies to a libel in personam and to an action at law; each of the joint tortfeasors is liable to the party injured for the full amount of the damage, regardless of their liability inter sese. It is unnecessary, therefore, to decide whether the situation calls for a division of the damages as between the two vessels.

■ Yet, as proctors for respondent contend, the navigation of the Antigone cannot be considered except in relation to the navigation of the Gaelic Prince. Respondent maintains that the maneuvers of the Antigone were predicated upon and compelled by the position of the Gaelic Prince on the westerly side of the channel. Our first inquiry, therefore, is to resolve the disputed questions of fact regarding the relative position of the two vessels.

There is some conflict of testimony regarding the position of the Antigone when the vessels first came in sight of each other. The pilot of the Antigone, Wood, testified ten years after the accident that he was on his own starboard side of the channel. He had previously testified, however, at an investigation by an Army Board shortly after the collision that he was on the east side of the channel, his own port side, and that, at the time, he knew he was on the wrong side of the channel. His earlier testimony is confirmed by that of one of the lookouts on the Antigone who testified that prior to rounding Buoy No. 10, the Antigone had passed within 200 feet of an anchored vessel on her own port side of the channel, and is strengthened by the statement of her fourth officer that after rounding the bend, on a starboard helm, the Antigone was on her port side of the channel. The Antigone's contention that she blew a signal of two blasts lends support to the conclusion that she was on her own port side of the channel, as in that position an invitation from her for a starboard to starboard passing would be understandable, although contrary to the statutory rule of navigation. I find that the Antigone was on her own port side of the channel from the time she was first sighted by the Gaelic Prince, at least until the port to port passing signals were exchanged.

■ The Ambrose Channel is a narrow channel under article 25 of the Inland Navigation Rules (30 Stat. 101, c. 4 [33 USCA § 210]). The La Bretagne (C. C. A.) 179 F. 286; The Amolco (C. C. A.) 283 F. 890; The Munaires (C. C. A.) 1 F.(2d) 13. That article provides: "In narrow channels every steam-vessel shall, when it is safe and practicable, keep to that side of the fair-way or mid-channel which lies on the starboard side of such vessel." This is a statutory rule which has long been enforced rigidly. The Victory and The Plymothian, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519.

The Antigone, however, seeks to defend her conduct in blowing a two-blast signal for a starboard to starboard passing on the ground that it would not have been "safe and practicable" to do otherwise. This argument she advances upon her theory that the Gaelic Prince was on the extreme westerly side of the channel, the Gaelic Prince's port side. The truth of this disputed question is not of vital concern. The exception to the statutory requirement (article 18, rule 1 [33 USCA § 203]) of a port to port passing finds its proper application not in convenience but in

necessity. The theory of respondent not only admits, but insists upon the feasibility of a port to port passing at the time when the single blast signals were exchanged. If the port to port passing was possible at the later time it must follow that it was even more feasible when the vessels were at a distance of two miles from each other. Proper navigation, therefore, required the Antigone to signal for a port to port passing. Even assuming that the Gaelic Prince was on her own port side of the channel, in violation of a statutory duty, nevertheless her first signal to the Antigone, at a time when a port to port passing was possible, was a single blast; this call for port to port passage was proper and susceptible of execution in the circumstances.

■ According to the Antigone's own story, she did not receive from the Gaelic Prince an assent to the two blast signal. Nevertheless, she failed to slacken her speed. This, in itself, is negligent navigation. The Antigone alone could not determine what course the other vessel should take. When a vessel signals for a starboard to starboard passing, she, in effect, merely extends an invitation for an agreement thereto to the other vessel. Yamashita Kisen Kabushiki Kaisha v. McCormick Inter. S. S. Co. (C. C. A.) 20 F.(2d) 25; The New York (C. C. A.) 86 F. 814. If the other steamer fails to assent, or if the course of the latter is uncertain, the signaling vessel is bound to stop. The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126; The Munaires (C. C. A.) 1 F.(2d) 13; A. H. Bull S. S. Co. v. U. S. (C. C. A.) 34 F.(2d) 614, 616. As was said by the Court of Appeals of this circuit: "A vessel which has signaled by two blasts that she intends passing to starboard instead of to port, and gets no assenting response, is in duty bound to stop, reverse, and, if necessary, come to a standstill, until the course of the other vessel has been ascertained with certainty, and the risk of collision removed." The Munaires, 1 F.(2d) 13, 15. See also The Bilbster (C. C. A.) 6 F.(2d) 954; The Sabine Sun (C. C. A.) 33 F.(2d) 42.

Even if the distance of the vessels was so great as not to require a reversal of the engines, the situation required at the least a slackening of speed, until a definite arrangement was consummated.

Respondent argues, however, that even if the Antigone be found guilty of these breaches of duty, her culpable conduct was a condition rather than a cause of collision. It asserts that a supervening negligence of the Gaelic Prince in failing to maneuver properly in accordance with the port to port passing arrangement was the proximate cause of the collision.

■ There is irreconcilable conflict in the testimony as to what occurred shortly before the collision. The burden of proving sole negligence on the part of the Gaelic Prince is upon respondent. The Antigone's conduct was the initial cause of the catastrophe. Even though a subsequent port to port passing was possible it made scant allowance for a margin of error. If the Antigone had ported her helm immediately and signaled for a port to port passing when she first sighted the Gaelic Prince, or if she had slowed her engines when she blew a signal of two blasts, the necessity of passing at close quarters would have been avoided. Since the Antigone culpably violated the rules initially respondent must show "not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." The Pennsylvania, 19 Wall. 125, 136, 22 L. Ed. 148; Lie v. San Francisco & Portland S. S. Co., 243 U. S. 291, 37 S. Ct. 270, 61 L. Ed. 726; The Sabine Sun (C. C. A.) 33 F.(2d) 42, 45. There is a presumption in favor of the vessel, the management of which is sought to be impugned by the vessel guilty of initial negligence. The City of New York, 147 U. S. 72, 85, 13 S. Ct. 211, 37 L. Ed. 84; Yamashita Kisen Kabushiki Kaisha v. McCormick Inter. S. S. Co., supra at 27 of 20 F.(2d).

I am of the opinion that respondent has failed to prove such negligence on the part of the Gaelic Prince as will absolve respondent from liability. The story of the Antigone's pilot, Wood, sounds improbable. He stated that at the time the Gaelic Prince blew her two blast signal (after the port to port passing had been agreed to previously) he saw her red light. He also said that at this time the vessels were about a length apart. In this estimate of distance he is corroborated by McCabe, the fourth officer of the Antigone. The estimates of distance from the bridge of the Gaelic Prince do not exceed two lengths. If Wood's statement that he saw the Gaelic Prince's red light is correct, she was somewhere off the Antigone's port bow, since the vessels were proceeding in opposite directions. The angle of collision was between forty five and ninety degrees. This means that the Gaelic Prince must have swung, according to Wood's story, across the bow of the Antigone, which at the same time was

swinging herself under a port helm. Even though the Antigone reversed her engines upon hearing the double blast her way must have been considerable, judging from the force of the collision. The Gaelic Prince claims to have changed from half speed to full speed ahead on both engines as she starboarded her helm. There is no reason to doubt this. The story we are asked to believe, then, is in substance this: that in the short space of from one to two ship lengths, the Gaelic Prince could swing sufficiently to come from a position on the Antigone's port bow across the bows of the Antigone, so as to meet the stem of the Antigone with her own starboard side at right angles, the Antigone at the same time, under a hard aport helm keeping her port bow toward the Gaelic Prince. The story sounds improbable. A vessel does not steer like an automobile. She must go a considerable distance before she leaves her course. I find that respondent has failed to sustain the burden imposed upon it by its initial negligence.

Robert E. Manley, Acting U. S. Atty., Horace M. Gray, Sp. Asst. to Atty. Gen., of New York City, for the United States.

Bigham, Englar, Jones & Houston (T. Catesby Jones and William J. Nunnally, Jr., both of New York City, of counsel), for appellee.

Carter, Ledyard & Milburn, of New York City (J. M. Richardson Lyeth and Rush Taggart, both of New York City, of counsel), amicus curiæ.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

PER CURIAM.

Decree affirmed on opinion below.