## THE NO. 2.

## THE GEORGE WASHINGTON.

### ALLEN N. SPOONER & SON, Inc., v. EASTERN S. S. LINES, Inc.

### No. 419.

Circuit Court of Appeals, Second Circuit.
July 18, 1932.

Macklin, Brown, Lenahan & Speer, of New York City (Horace L. Cheyney, of New York City, of counsel), for libelant-appellant.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt and James McKown, Jr., both of New York City, of counsel), for claimant-appellee.

Before MANTON, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

On March 15, 1930, the steamship George Washington, a passenger steamship 389 feet long, was in collision with a derrick in tow of the tug Cambrai in the East River below Corlears Hook. The owner of the derrick sued the steamship; the tug was found solely at fault; and the libel was dismissed.

Just before the accident occurred, the Cambrai, a Diesel tug 65 feet in length, was going up the East River with a tandem tow consisting of the steam derrick Lighter No. 2 owned by the libelant, a catamaran loaded with piles, and a small raft all in the order named. The line of the Cambrai to the derrick was about 180 feet long, and the catamaran was close behind and in turn was closely followed by the raft. The derrick Citizen was then anchored toward the Brooklyn side of mid-river, and the Cambrai was going up on a course between mid-river and the Citizen and about 75 feet to the New York side of that derrick. The tug Berwind, also going up river with a tow, passed the Cambrai when about abreast of the Citizen, and about 100 feet nearer than the Cambrai to the New York shore.

While this was taking place, the George Washington came down the river to dock at Pier 18, North River. She was due there at 8 o'clock a. m. and was late. Her master saw both the Berwind and the Cambrai before he rounded Corlears Hook. Just before rounding the Hook, he gave a two-blast signal to the Berwind which was answered with two blasts and resulted in a safe starboard to starboard passing. Just after rounding the Hook, he gave a two-blast signal to the Cambrai which that boat answered with two blasts. At that time these boats were nearly head on and about in mid-river. After the starboard to starboard passing had been agreed to, neither boat altered her course for at least a minute and a half, when the Cambrai went to port. The George Washington reversed, and her captain testified was making stern way when she came in contact with the No. 2. Her captain testified that, when he gave the two-blast signal to the Cambrai, he could neither go to port nor to starboard, and could only reverse as he did to avoid collision. The evidence as to the craft in the river between the derrick Citizen and the Brooklyn shore was conflicting, but we accept the finding that the George Washington could not safely have gone to the Brooklyn side of that anchored derrick. The master of the Cambrai thought the steamship would take that course, however, and in that erroneous belief delayed taking any action to carry out the agreed starboard to starboard passing until it was too late to prevent the collision. There were no other boats in the river between the Citizen and the New York shore which would have interfered with the navigation of either the George Washington or the Cambrai.

It is unnecessary in deciding this case to put anything upon the East River Statute which requires vessels to keep to the starboard side of mid-channel, and so the close question of fact regarding the exact posi-

tion of the George Washington relative to mid-channel need not be decided. The boats, when nearly head on and when the Cambrai was at least favoring the Brooklyn side of mid-channel as she should have been, agreed to pass starboard to starboard. Neither took adequate steps to carry out their agreement until it was too late to avoid the collision.

It is claimed that the George Washington could not go to port when she proposed the starboard to starboard passing because she was too close to the Citizen and because of the craft to the Brooklyn side of that derrick and could not then go to starboard because her engines were stopped and the ship was slowly surging ahead. Whether these reasons were right or wrong need give us now no concern, for the outstanding fact is established that the George Washington proposed to pass the Cambrai contrary to the provisions of article 18 of Rule 1 of the Inland Rules which calls for a port to port passing under such conditions and did so at a time when she admittedly could do nothing to aid the maneuver except stop. She took herself out of the rule by agreement, and depended upon the Cambrai to get out of the way. She agreed to do something she was unable to do her part to perform. The Cambrai without any real excuse delayed to act after consenting to the George Washington's proposal until she too was helpless in the face of conditions which resulted from both boats permitting themselves to get into such close quarters.

The George Washington was not justified in proposing a passing contrary to the rule when she could not do her part to make such a passing possible. Having chosen a passing other than what was contemplated by law when a port to port passing was feasible and her choice but a matter of preference, she must be held to have chosen at her own risk whether the Cambrai consented or not. The Hokendaqua (C. C. A.) 251 F. 562; The Integrity (C. C. A.) 38 F.(2d) 39. Yet the Cambrai had no good excuse for not altering her course at once to permit the passing to which she had agreed. It is plain enough that each boat put its main reliance upon the action of the other instead of its own and that this collision became inevitable while each was waiting in vain for the other to change its course. They both should have avoided such a risk of collision, Ocean S. S. Co. v. United States (C. C. A.) 38 F.(2d) 782; and for their failure to do so both must be held at fault.

Decree modified accordingly.