THE W. L. STEED.

THE WILLIAM C. MOORE.

THE PAPOOSE.

THE MARGARET A. MORAN.

No. 448.

Circuit Court of Appeals, Second Circuit.
July 22, 1935.

Macklin, Brown, Lenahan & Speer, of New York City (Horace L. Cheyney, of New York City, of counsel), for The Margaret A. Moran and appellee Moran Towing & Transportation Co.

Barry, Wainwright, Thacher & Symmers, of New York City (Earle Farwell, of New York City, of counsel), for Petroleum Navigation Co.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

These causes were consolidated and tried together, and are here considered as one.

On December 18, 1930, with clear weather, wind negligible, and at a tide high water slack, the steamship Papoose, without motor power of its own, was towed by four tugs, under the direction of the towing master, from Warner, N. J., bound for Todd's shipyards at Brooklyn, N. Y. The towing master was employed by the Moran Towing & Transportation Company. She had no propeller, and displayed two black balls in her rigging, indicating that) she was a dead ship. The William C. Moore was stationed ahead of the Papoose on a hawser about 40 fathoms in length. The Margaret A. Moran was made fast on the portside, the Howard C. Moore on the port quarter, and the Helen Moran on the starboard quarter. The master, third officer, and quartermaster of the ship were on the bridge with the towing master, and the chief officer was stationed on the forecastle head. This flotilla proceeded on its starboard side of the channel within 75 feet of the Staten Island edge, and reached a point somewhat to the westward of Buoy 8 near Downey's Shipyard, Staten Island, when the W. L. Steed, with the tug Mexpet made fast on her port bow, approached from the opposite direction and was then in the vicinity of Shooter's Island near Red Buoy No. 6. The Papoose flotilla and the W. L. Steed were holding to their respective starboard sides of the channel when the vessels came in sight of each other about five-eighths of a mile apart. The Papoose flotilla was proceeding at about three to three and a half knots, and the W. L. Steed from six to seven knots. As they continued on, they were in a position to pass with safety port to port. When about fifteen to sixteen hundred feet apart, the W. L. Steed altered her course, sheering to

Lynch & Hagen, of New York City (Anthony V. Lynch, Jr., and Charles W. Hagen, both of New York City, of counsel), for The Wm. C. Moore, and appellant John E. Moore Co.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Stanley R. Wright, both of New York City, of counsel), for The W. L. Steed.

port to cross the bow of the Papoose, and sounded two short toots of her whistle, and later blew a distinct two-blast signal. The difference in time between these signals is in dispute. The William C. Moore answered immediately with a danger signal. The engines of the three tugs alongside the Papoose were reversed, the anchor of the Papoose was dropped, and her headway stopped. The W. L. Steed did not stop or reverse engines, but increased her speed, and put her helm hard-a-port, attempting to swing around the bow of the Papoose. The William C. Moore, attempting to escape the W. L. Steed, ported her helm and made for the Staten Island shore. The W. L. Steed parted the towing hawser between the Papoose and the William C. Moore, and then brought her starboard side amidships into collision with the bluff of the starboard bow of the Papoose. The collision occurred within 400 feet of Buoy No. 7. At the time of the contact, the Papoose was about 75 feet to 100 feet off the Staten Island channel line. Both the W. L. Steed and the Papoose sustained damages.

The District Judge found that the Papoose came up continuously on the Staten Island side of the channel, while the W. L. Steed went over to the Staten Island side of the channel preceding the collision. He found two sets of two-blast signals by the W. L. Steed; no signal was given by the W. L. Steed when she first saw the Papoose flotilla; that the ships were "fairly close together before the Steed gave any signal." He found the William C. Moore blew a danger signal immediately after the second of the two-blast signals, "if there was a substantial separation between the two sets of signals by the Steed—or immediately after the two sets of signals if they were given close together." Moreover, he found that no assent whatsoever was given by the Moore or the pilot of the Papoose flotilla to the Steed's proposal of a starboard to starboard passing.

The court approved the efforts of the Moore to avoid the collision, except he held that the Moore violated pilot Rule III, saying: "She was in extremis after the signals from the Steed and the blowing of the danger signal. There was not time for her to cut the hawser. Moreover, I think the holding of the hawser had little effect, if any, in bringing about the collision. The Moore also acted reasonably in pulling to starboard. The Steed was nearly on her and she was within her rights in pulling

away to starboard in an effort to escape the collision with herself and to save the lives of those on board."

The court found the Steed guilty of violating the Narrow Channel Rule (Inland Rules, art. 25, 33 USCA § 210). She was on the wrong side of the channel without reasonable excuse for being there and without consent of the Moore or the tow master of the Papoose flotilla, and he said: "The catastrophe was caused by Captain Rex (Captain of the Steed) miscalculating the situation and conceiving that, by quickening his speed, he could rush in and get between the Papoose flotilla and the Staten Island side of the channel without colliding. He took a chance and the collision was his fault."

We agree that the Steed was guilty of violation of the Narrow Channel Rule. Article 25 requires, in narrow channels, that every steam vessel shall, when it is safe and practicable, keep on that side of the fairway or midchannel which lies to the starboard side of the vessel. This rule was clearly violated. She was likewise guilty of fault in taking the sheer and attempting a starboard to starboard passage under the circumstances. The Victory & The Plymothian, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519; The No. 2, 60 F.(2d) 733 (C. C. A.); Royal Mail Steam Packet Co. v. Companhia De Navegacao Lloyd Brasileiro (The Silarus), 50 F.(2d) 207 (D. C.); Humble Oil & Refining Co. v. Lloyd Royal Belge Societe Anonyme (The Brazilier), 49 F.(2d) 286 (D. C.); Marshall Field & Co. v. United States, 48 F.(2d) 763 (C. C. A.); The Bilbster, 6 F.(2d) 954 (C. C. A.).

The more serious question on this appeal is the liability of the William C. Moore. Pilot Rule III requires that "The Signals For Passing, by the blowing of the whistle, shall be given and answered by pilots, in compliance with these rules, not only when meeting 'head and head', or nearly so, but at all times, when the steam vessels are in sight of each other, when passing or meeting at a distance within half a mile of each other, and whether passing to the starboard or port."

And article 18, Rule 1 (Inland Rule 1, 33 USCA § 203, Rule 1), provides that, when steam vessels are approaching each other head and head or nearly so, they shall pass port to port and give, as a signal of intention so to do, one short and distinct blast of the whistle and the other vessel

shall answer promptly with a similar blast. But if the course of the vessels are so far to the starboard of each other so as not to be considered head and head, either vessel shall immediately give two short and distinct blasts of the whistle and the other vessel shall answer promptly by two similar blasts of the whistle, and they shall pass on the starboard side of each other. This rule applies to cases where the vessels are meeting end on or nearly end on, in such a manner as to involve risk of collision; in other words, in cases in which by day each vessel sees the masts of the other in a line or nearly a line with her own and by night to cases in which each vessel is in such a position as to see both the side lights of the other. 33 USCA § 203. When the vessels first saw each other, no passing signal was sounded, and they continued to maintain their course, the Steed on her starboard side of the channel, but, when within fifteen to sixteen hundred feet of each other, the Steed took a sheer to port, and it was then that the signal of two blasts was given. Otherwise it was clear from appearances that the vessels might have passed port to port safely. Each vessel was observing the Narrow Channel Rule up to the time of the sheer. The Steed's continuance until the vessels were within fifteen or sixteen hundred feet of each other and then suddenly altering her course to port across the bow of the Moore and sounding a two-blast signal indicates an untimely change by the Steed to a course which would carry her across the bow of the Moore. Whether this was intentionally or unintentionally done, it was undertaken too late. The Steed's signals were not sounded until the sheer.

The evidence is not very satisfactory as to how much time lapsed between the first two blasts and the second. The pilot of the Steed testified that his ship was swinging to port before he sounded any whistle or signals, and, when asked what was the interval between the time of the two-blast whistles, he said, "A few seconds, less than a minute." The captain of the Moore said that the signal was given when the Steed was 1200 feet away and, when asked about the two whistles, said, "Well, it was two and right after two following immediately, instant." The District Court found, "There is some testimony tending to show that two of the two-blast signals were so close that for practical purposes they may be regarded as one," and "As I have said it is difficult to determine how close together the first and second signals of the Steed were; and I believe that it is of little significance to make the determination." When the Steed altered her course across the channel in violation of the Narrow Channel Rule and gave its signal, the majority of the court hold there was sufficient time between the first and second blast signals either to agree or disagree with the attempted maneuver or for the Moore to have stopped or backed. The danger was imminent, and the Moore blew an alarm but did not attempt to avoid the collision in time. The San Simeon, 63 F.(2d) 798 (C. C. A.); The Cherokee, 70 F.(2d) 316 (C. C. A.).

In view of the testimony as to the distance the vessels were apart when the signals were given, the majority think there was time between the giving of the first and second signals by the Steed after she altered her course, for the Moore to do more to avoid the collision than blow a danger signal. Both vessels must be held blameworthy.

The Steed contends that the master of the tug Margaret Moran, while on board the steamship and acting as her pilot, was guilty of negligence, and therefore the Margaret Moran should be held liable in rem. The tug could only be held liable in rem for the faults committed by it. The Edward G. Murray, 278 F. 895 (C. C. A.); The Sarnia, 261 F. 900 (C. C. A.); The Coamo, 267 F. 686 (C. C. A.). The master of the Moran was not acting as her master only while on board the Papoose. While there, giving orders to all three of the tugs made fast alongside the Papoose, he was in command of the three. But he was guilty of no fault. The tugs alongside were helpers; the William C. Moore was leading the flotilla. Certain duties were cast upon the pilot, but he cannot be charged with failure to give orders to the Moore. It was impracticable to communicate orders to her at a distance—250 feet away. His only means of communication was by word of mouth. To be sure, he might have had the tugs alongside blow alarm whistles, but, for the reasons we have stated, the Moran navigated properly under all the circumstances, and no fault attaches to the pilot. The Moore was in a better position than the pilot on board the Papoose to take measures necessary for safe navigation.

Decree affirmed.