**COMPANIA PUNTA ALTA, S. A., v. DALZELL et al.**

**DALZELL et al. v. COMPANIA PUNTA ALTA, S. A.**

**INSURANCE CO. OF NORTH AMERICA et al. v. DALZELL et al.**

**THE MARJORY.**

**THE DALZELLACE.**

**THE CAPTAIN A. F. BENNETT.**

**THE LLOYD H. DALZELL.**

**THE DALZELLITE.**

United States District Court
S. D. New York.
Jan. 21, 1952.

392

Herbert P. Reid, New York City, for libelant and cross-respondents Compania Punta Alta, S. A.

Burlingham, Veeder, Clark & Hupper, New York City, Eugene Underwood, New York City, of counsel, for respondents and cross-libelants Dalzell.

Bigham, Englar, Jones & Houston, New York City, Charles A. Van Hagen, Jr., New York City, of counsel, for libelants Insurance Co. of North America, et al.

IRVING R. KAUFMAN, District Judge.

These consolidated suits arise out of a collision in New York Harbor on December 11, 1946, between the S/S Marjory, owned by libelant Compania Punta Alta, S.A. (hereinafter referred to as Compania) and the S/S Joseph E. Wing (now the S/S Emanuele V. Parodi), a dead ship

in the tow of four tugs owned by Dalzell Towing Co., Inc. Compania brings this libel for $25,000 damages against respondent Lloyd H. Dalzell (hereinafter referred to as Dalzell) in personam and the four tugs, in rem. The libel was originally brought against the Wing also, and Dalzell impleaded the United States of America as owner, and the United States Maritime Commission, but that libel and impleading petition were subsequently dismissed by consent of the parties. Thereafter, the Insurance Company of North America and others, as insurers of damaged cargo aboard the Marjory, brought a libel against Dalzell for damages arising out of the collision, and Dalzell filed a cross-libel against Compania for recoupment in the event of a recovery by the insurers against Dalzell.

The facts appear to be these: At about 4:25 P. M., December 11, 1946, a tow made up of the four Dalzell tugs and the dead ship Joseph E. Wing left Shewan's Shipyard in Gowanus Bay. The Wing was a Liberty ship of 7,176 gross tons, with a beam of 57 feet and a length of 422.8 feet. The tug Captain Albert F. Bennett was in the lead, a hawser running from her stern back to the stem of the Wing. Made fast to the Wing were the other three tugs; the Lloyd H. Dalzell on the Wing's starboard bow; the Dalzellite on her starboard quarter; and the Dalzellace on her port quarter. The overall length of the tow was between 800 and 1000 feet.

The Wing was due to be laid up and, as such, she was without power when Dalzell took her into tow. The entire tow was headed for 134th Street, Hudson River. It got under way from Shewan's and proceeded out of Gowanus Bay, up Red Hook Channel, and then turned left at about Red Hook. Its heading was roughly northwest as it passed below the southern end of Governor's Island and made for the western side of the Main Ship Channel. Once it cleared Red Hook, the course of the tow was set by the tug Bennett, with Captain Bennett, himself, in charge.

At about 4:47 P. M. the S/S Marjory, a freighter of 2,323 gross tons, 251 feet in length and 43.6 feet in beam, undocked from Pier 20, East River, and was bound to sea on a course that took her down the East River, around the northern end of Governor's Island and roughly southwest toward the center of the Channel.

During the time the tow and the Marjory were each heading toward the Main Ship Channel, the Staten Island ferry, Dongan Hills, was proceeding north from Staten Island to the Battery along a course which skirted the eastern edge of the Channel or the western side of Governor's Island.

Weather was good and visibility excellent. There was a strong ebb-tide running between 4:30 P. M. and 5.00 P. M., and darkness was falling.

At about 5:00 P. M. the Marjory and the Wing collided close to Buoy 31A on the westerly side of the Channel. The port side of the Marjory, approximately abreast of her foremast, struck the stem of the Wing at almost a right angle. The tug Lloyd H. Dalzell, which was on the starboard bow of the Wing, cut her lines to avoid being crushed between the two vessels. Shortly thereafter, the Marjory repaired to anchorage off the Statue of Liberty, and the Wing and her assisting tugs proceeded up the Channel toward New York. As a result of the collision, the Marjory and her cargo allegedly sustained damages of $25,000. There was no damage to the Wing or the tugs.

The detailed factual allegations and contentions which follow are in sharp dispute. In substance, Compania claims that the entire Dalzell towing operation suffered from divided command with resulting negligent navigation for which Lloyd H. Dalzell is liable in personam, and the four tugs are jointly and severally liable in rem; that there was no justification for the tow being on the west side of the Channel, which was the wrong side; that the Wing showed no visible green, or starboard, side light; that the tow failed to respond to a signal proposing a port-to-port passing and failed to comply with the "Half-Mile Rule"; and

that in the few minutes just prior to the collision the whole tow was coming out of Buttermilk Channel on the south side of Governor's Island and was zigzagging roughly northwestward across the Main Ship Channel when the Marjory proposed the port-to-port passing. Dalzell, on the other hand, alleges that Compania was negligent in failing to see the Wing's green side light and failing to hear the alarm signals given by the tug just prior to collision; and that the Marjory's acting on her unanswered proposal for an unwarranted port-to-port passing with the tow was the proximate cause of the collision.

The divergent testimony in this case is not unusual in such suits. Judge Learned Hand has said: "However, it has long been the custom of admiralty judges to accept a story generally, of which they are obliged to reject the particulars, mending it, as it were, in its weaker spots. Indeed, it would often be quite impossible otherwise to reach any decision at all, for the ardor of each side frequently colors both versions too much for the complete acceptance of either." The Bellhaven, 2 Cir., 1934, 72 F.2d 206, 208.

### Command of the Tow

Prior to leaving Shewan's, the tug captains, one of whom was the pilot on the bridge of the Wing, had no verbal agreement as to who was to command the operation. The evidence indicates that the course of tow was to be set by the Wing's pilot until she cleared Red Hook. Thereafter the captain of the lead tug Bennett was to set the course through the Main Ship Channel and up the North River. Although there was telephonic communication among the tugs, there was none between the tugs and the Wing. Communication between the tugs and the Wing was carried on by means of oral messages given through a megaphone and exchanges of mouth whistle signals. Since the Wing was without power, these methods of communication seem reasonable and appropriate under the circumstances. The absence of any verbal agreement as to command of the tow does not have any

compelling effect. Indeed, the Bennett, with the acquiescence of the others in the tow, set the course for crossing the Main Ship Channel and heading to the tow's North River destination, and the Bennett was in fact in command at the time of collision. I am not convinced that the command of the operation, in so far as it is material here, was divided. The tug captains and Wing pilot at all times understood the course the tow was to take and the course set by the Bennett was followed without dissent or misunderstanding. Whatever negligence may be imputable to Dalzell does not turn on the method of command utilized during the tow.

### Course of Tow

The location of the ships at the time of the accident is of importance. Both the Wing and the tow were on the west side of the Channel just prior to the collision. Article 25 of the Inland Rules, 33 U.S.C.A. § 210 provides: "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or midchannel which lies on the starboard side of such vessel."

The Main Ship Channel to the west of Governor's Island is a narrow channel within the scope of this rule. The Bee, 2 Cir., 1905, 138 F. 303; The La Bretagne, 2 Cir., 1910, 179 F.2d 286, certiorari denied 1911, 219 U.S. 585, 31 S.Ct. 470, 55 L.Ed. 347.

I am cognizant that this rule, like certain other Inland Rules of Navigation, is not inflexible; in construing and obeying it, the hazards of navigation and collision must be considered. If they are such as to present a situation of immediate danger, there may be a valid departure from the requirements of the rule. 33 U.S.C.A. § 212, The P.R.R. No. 32, 2 Cir., 1917, 240 F. 118. If exception is taken to the narrow channel rule, there should be a showing of danger and impracticability if the exception is to be held valid. The Benjamin Franklin, 2 Cir., 1906, 145 F. 13. Custom alone will not excuse an act contrary to the require-

ments of the rule. The Michael Tracy, 2 Cir., 1930, 43 F.2d 965.

It is Dalzell's contention that on tows from Gowanus to the North River it is customary to proceed below the southerly portion of Governor's Island to the west side of the Main Ship Channel and thus to head up the Channel. It justifies the custom on grounds that this course takes the tows out of the path of outbound ships coming down off the ranges from the East River as the Marjory was doing. As a result, Dalzell asserts, such conduct avoids embarrassing outbound East River traffic.

However, it has not been established to my satisfaction that if the Bennett had kept to a course on the east side of the Channel, in compliance with Article 25 of the Inland Rules, a situation of danger or impracticability would have resulted. Nothing in the testimony leads me to find that it would have been unsafe or impracticable for the Bennett to have set a course up the eastern side of the Main Ship Channel. Indeed, there is nothing to indicate that the actual existence of ship traffic coming from the East River into the Main Ship Channel or at the northern end of Governor's Island compelled the Bennett to cross over at the south. I find no justification for the course she actually followed. The Bennett's course of tow was a negligent violation of Article 25, 33 U.S.C.A. § 210.

### Contention Re Absence of Green Light on Wing

Compania contends that it saw no green navigation light on the Wing. Dalzell asserts that the Wing did have all her navigation lights showing, and that although the lights were kerosene rather than electric, they were visible from one to two miles. From the evidence adduced at trial, I am not persuaded that Compania has established the malfunction of the kerosene side lights on the Wing. It is perfectly clear, however, that the Marjory did see the green side lights on the Bennett and on the two tugs on the starboard side of the Wing, as well as the "not-in-command" lights on the Wing, and such confusion as may have existed as to the course of the tow did not turn on the alleged but unproven absence of a green side light on the Wing.

There was indeed confusion, but it was in good part caused by the Marjory's failure to see what in fact could have been seen by a careful lookout. I am led to the conclusion that the Marjory was negligent in failing to maintain an attentive lookout and in failing to see the green side light on the Wing, which I find was showing. The fact that the Wing's side light was not observed by the Marjory's lookout helps to explain why the navigation of the Marjory was so confused and inappropriate to the demands of the situation. The tow was angling crabwise across the Main Ship Channel; even a sharp lookout would perhaps have had some difficulty in deducing the course of the tow, for it was apparently moving on no set course in the Channel. The confusion that the path of the tow would have created in an attentive lookout must have been more confounded by the Marjory's failure to observe the green side light on the Wing.

### Danger Signals

There was no proof to indicate that anyone on the Marjory heard danger signals sounded by the two starboard tugs when the collision was imminent, but such signals apparently were given. They were heard by the ferry Dongan Hills which was proceeding up the east side of the Channel. I find that the Marjory's failure to hear the danger signals given by the two starboard tugs in the tow constitutes further proof of its inattention.

### Positions and Courses of Marjory and Tow Prior to Collision

Testimony as to the positions of the Marjory and tow approximately ten minutes preceding the collision is a welter of conflicting allegations, yet from this contradictory evidence the Court must determine the answer to two crucial questions: (1) At the time the tow and Mar-

jory first saw each other, which it has been established was approximately ten minutes before the collision, precisely where were they? (2) During that ten minute period what were their courses which ultimately led to the collision?

It is Dalzell's contention that when the tow first saw the Marjory the Marjory was coming out of the East River between the north end of Governor's Island and the Staten Island ferry slip on the Battery. The tow at that time, Dalzell maintains, was near Buoy 31A on the west side of the Main Ship Channel, heading roughly north toward the North River. Assuming that such were the relative positions of the Marjory and tow, Dalzell's assertion that at first the tow was showing the Marjory green side lights and the Marjory was showing the tow red would be credible. Dalzell then contends that in this situation the so-called "sinuousity rule" would apply. In Commonwealth & Dominion Line v. United States, 2 Cir., 1927, 20 F.2d 729, 731, reversed on other grounds 278 U.S. 427, 49 S.Ct. 183, 73 L.Ed. 439, L. Hand, C.J., held: "A ship is on a steady course, not only when her heading does not change, but whenever her future positions are certainly ascertainable from her present position and movements. A steady course may thus involve many changes of heading; it is enough if these can with accuracy be foretold. If they can, so that at any given time in the future her position can be ascertained, she is on a course, and if that course crosses the course of another vessel, who holds her on her starboard hand, the latter must keep out of her way. Whether the way be sinuous, or the speed variable, makes no difference, so it be plainly disclosed."

If I accept Dalzell's allegation as to the relative positions and courses of the vessels when they first came within sight of each other, the Commonwealth holding would lead me to find that the Marjory should have assumed that the fixed course of the tow was up the west side of the Main Ship Channel; the tow should have assumed that the Marjory was on a course to proceed down the Main Ship Channel; and the respective ships should have navigated accordingly.

 If, however, I accept Compania's contention, the Commonwealth holding works to the advantage of Compania and against the interest of Dalzell. Compania seems to agree with Dalzell that when the Marjory and tow first came within sight of each other the tow was showing its green side lights and the Marjory was showing her red. However, Compania insists that although the Marjory was between the north end of Governor's Island and the Staten Island ferry slip, the tow was *not* on the west side of the Channel at the time, but rather was coming out of Buttermilk Channel below the south end of Governor's Island and was angling on a zigzag course northwestward toward the Main Ship Channel. In this situation the Commonwealth rule would seem to require the tow to assume the outbound Marjory was going to carry out her course in accordance with the rules of navigation and proceed down the Channel to the westward of the center line thereof. The Marjory would thus be the privileged vessel and the tow would have the burden. As such the Marjory would have had the right to assume that the tow would proceed inbound on its starboard side of the Channel. The privileged vessel need not navigate on the suspicion that the burdened vessel will not do her duty. The Brittania, 1893, 153 U.S. 130, 14 S.Ct. 795, 38 L.Ed. 660; Hutchinson v. The Northfield, 1878, 154 U.S. 629, 14 S.Ct. 1184, 24 L.Ed. 680; The Delaware, 1896, 161 U.S. 459, 16 S.Ct. 516, 40 L.Ed. 771.

As I have stated, it has been established to my satisfaction that the Marjory and tow first came within sight of each other approximately ten minutes before the collision. The Marjory, making about six knots per hour over the ground, was between the north end of Governor's Island and the Staten Island ferry slip on the Battery, and the tow, making about three knots per hour over the ground, was moving out of Buttermilk Channel on the eastern side of the Main Ship Channel zigzagging toward the western side. The tow was moving across a strong ebb-tide

which caused the lead tug Bennett to yaw frequently on a jagged course. I do not, however, accept Compania's contention that the lead tug Bennett first showed the Marjory green and then red shortly thereafter. I do not believe that the Bennett's yawing was ever severe enough to cause her to shut out her green and open her red light to the Wing, but it was enough to put her on a jagged course.

█ What seems to be the more acceptable version is that the outbound Marjory intended to make for the west side of the Main Ship Channel, and anticipated a port-to-port passing with the tow. When she was at about mid-channel off the north end of Governor's Island, some seven or eight minutes before the collision, the Marjory proposed a port-to-port passing with a one-whistle signal. Had the proposal been accepted, the Marjory might have cleared the tow and avoided the necessity of coming down the Channel between the tow and the northbound ferry Dongan Hills. What had been the Marjory's first rapid appraisal of the navigational situation was quickly transformed into an act of negligence. The Marjory moved down toward the west side of the Channel and in doing so she and the tow were approaching a green to green crossing, for the tow by now was well into the Channel, angling crabwise on a roughly northwesterly course. The relative positions of the Dongan Hills and the tow were apparently such at the moment of the Marjory's port-to-port proposal that the tow considered the proposal directed to the Dongan Hills. In any event, without waiting for an assent to her proposal, the Marjory altered her course to the westward by turning right and put her engines full speed ahead in an attempt to negotiate a port-to-port passing with the tow. The law is well settled that a vessel proposing either a port-to-port or starboard-to-starboard passing must wait upon the other vessel's assent before she changes her course. City of New York v. American Export Lines, Inc., 2 Cir., 1942, 131 F.2d 902; Marshall Field & Co. v. United States, 2 Cir., 1931, 48 F.2d 763.

Very soon after the Marjory turned right, the three tugs alongside the Wing were ordered to start backing at full speed, the Bennett pulled westward and the two tugs on the starboard side of the Wing sounded danger signals. Their signals were apparently heard by the Dongan Hills but went unnoticed on the Marjory. Acting *in extremis,* the Marjory blew a three whistle backing signal and put her engines full astern. This maneuver ported her stern and turned her broadside into the Channel. The strong ebb-tide swept her down onto the Wing with the resulting collision.

## Respective Liability

If the proximate cause of the collision is solely Dalzell's negligence, there will be recovery by Compania for its damages, the insurers will recover their claims, and Dalzell's cross-libel will fail. If the proximate cause is solely Compania's negligence, its libel will be dismissed, there can be no recovery by the insurers against Compania since Compania would be exempted from liability under the limitation of liability clause of the Harter Act, 46 U.S.C.A. § 192, and Dalzell's cross-libel would be dismissed since it claims no collision damage. There would, of course, be no recovery to the insurers against Dalzell.

If the proximate cause of the collision is the concurrent negligence of Dalzell and Compania, damages must be divided according to a formula which itself is put in issue in the action. Compania urges that in such event the damages should be divided on the basis of one-fifth for the Marjory's negligence, and one-fifth each for the negligence of the four Dalzell tugs since, it alleges, each tug was independently at fault. Dalzell asserts that in the event of a holding of concurrent negligence, damages are to be divided equally between the lead tug Bennett, the only possible negligent vessel in the tow, and the Marjory.

## Cause of Collision

█ I am led to the conclusion that the proximate cause of the collision was the

concurrent negligence of the tug Bennett in faultily navigating the tow to and on the wrong side of the Main Ship Channel in a situation which did not relieve her of the requirements of Article 25 of the Inland Rules, supra, and the Marjory's negligence in maintaining an inadequate lookout and proceeding on her proposal for a port-to-port passing with the tow before and without receiving assent to that proposal.

The assertions made by Dalzell are that if there was fault in navigating on the wrong side of the Channel, that fault was a condition and not a contributory cause of the collision and that such fault was neutralized by the subsequent negligence of the Marjory. It cites as its authority The Deutschland, 2 Cir.1937, 90 F.2d 454; The Bellhaven, supra; The La Bretagne, supra and The Wrestler, D.C.S.D.N.Y.1912, 198 F. 583. The facts in these cited cases distinguish them as a group from the instant case. They were all situations in which the vessels involved were on parallel courses with sufficient distance between them to make starboard-to-starboard passings the obvious requirement. The instant situation was a crossing situation, and the Marjory and tow were not sailing parallel courses at any time before the collision. The tow was sailing approximately across a strong ebb-tide which was forcing the Bennett to yaw considerably and thus to lead the tow across the Channel on a zigzagging northwesterly course. Coming down the tide on roughly a southwesterly course was the Marjory. The tow and Marjory were thus in a crossing situation and not a passing one. This conclusion is strengthened by the undisputed fact that the vessels collided at almost right angles. The Marjory was thrown athwart the tide when she tried to back out of the impending collision. This is most likely explained by the fact that she was moving southwesterly, rather than due south. Indeed, had she been moving due south, she would, when *in extremis,* have turned rather than backed as she did.

■ At the outset, had the Bennett followed the course prescribed by Article 25 of the Inland Rules, supra, there would not have been created this predicament from which the tow and Marjory could not extricate themselves before the collision. In such an instance it is not sufficient for the Bennett to contend that her fault "might not have been one of the causes, or that it probably was not, but that it could not have been." Marshall Field v. United States, supra, 48 F.2d at page 766, and cases cited therein. The proof has fallen far short in establishing this to my satisfaction.

The Marjory's maneuver to her right, before she received assent to her proposal for a port-to-port passing, drove the ship down into the path of the unlawfully positioned tow. The maneuver was a negligent act, first because it was carried out without the required assent, and secondly because the maneuver itself seems to have been quite at variance with that which was actually called for by the relative positions and headings of the tow and Marjory.

■ I am led to the conviction, however, that Dalzell's fault is imputable only to the tug Bennett which clearly commanded the whole tow and set its course from the time it passed Red Hook until the collision occurred. There has been no showing of negligence on the part of the other three tugs in the tow. They were not independent. They were merely helpers. A tug employed with other tugs to move a vessel can only be held liable in rem for faults committed by it. The W. L. Steed, 2 Cir., 1935, 79 F.2d 2.

### Major and Minor Fault

■ Compania suggests that the facts herein warrant the application of the "major and minor fault" doctrine in favor of the Marjory. In The City of New York, 1893, 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84, the rule was set out: "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to

the propriety of the conduct of such other vessel should be resolved in its favor." See also The Oregon, 1895, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943.

■ The rule is inapplicable in the instant situation because neither the Bennett's nor the Marjory's negligence, standing alone, is adequate in itself to account for the collision. Their *concurrent* negligence was the cause of the collision.

## Half-Mile Rule

Compania has raised the question of Dalzell's alleged failure to abide by the provisions of Supervising Inspector's Rule 312.3 (formerly Rule III) for Inland Waters, commonly known as the Half-Mile Rule. It requires that vessels must exchange passing signals when they are within a half-mile of each other, and Dalzell contends that the rule is without force of law since made in derogation of a federal statute. It is not necessary for me to resolve this question, since the analysis of proximate cause here in no way depends upon whether the rule is valid or invalid, or whether the rule was obeyed or disobeyed. The negligent acts cited above which constitute the proximate cause of the collision would not be mitigated or aggravated in the instant case by any opinion I might express as to the applicability of the Half-Mile Rule or by a discussion of any of the other alleged acts of negligence.

## Damages

■ I hold that collision damages are to be divided equally between (a) respondent Dalzell and his tug the Bennett and (b) libelant Compania Punta Alta, S. A. An interlocutory decree in favor of insurers for damage to the Marjory's cargo shall be entered subject to further proof of interest and extent of damages. The amount respondent Dalzell and his tug the Bennett pay out to cargo may be included by them in damages which they are to share equally with Compania Punta Alta, S. A. The Chattahoochee, 1899, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801.

Let decrees be entered herewith.