Thurston CRAWFORD, d/b/a River Transit Company and Howard Bus Line, Inc., Claimant of Tug THE SUWANNEE, Appellants,

v.

INDIAN TOWING COMPANY, Inc., as owner of the M/V THE CHEROKEE, Appellee.

No. 16156.

United States Court of Appeals Fifth Circuit.

Jan. 18, 1957.

Rehearing Denied March 1, 1957.

George B. Matthews, Lemle & Kelleher, New Orleans, La., for Thurston Crawford, d/b/a River Transit Co., and Howard Bus Line, Inc., appellants.

Lansing L. Mitchell, Deutsch, Kerrigan & Stiles, New Orleans, La., for appellee.

Before BORAH, TUTTLE and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

This appeal in admiralty from the interlocutory decree of the district court complains of the holding that appellants, as charterers and owners of the tug Suwannee, are solely responsible for colli-

sion damages to appellee's motor vessel Cherokee.

For the purpose of the appeal, appellants concede, as they must, the correctness of testimony adduced by appellee since the trial court accepted it as correct

The facts as disclosed principally by first mate Mock, who was navigating the Cherokee, together with the charts and diagrams, about which there is no dispute, were briefly as follows:

Just before sunrise on June 29, 1953, in adequate daylight in clear weather, the two craft here involved were approaching each other in the Louisiana portion of the intracoastal waterway, a waterway with a dredged channel of 125 to 150-foot width. The Suwannee, an 85-foot tug, was pushing a 240 foot loaded oil barge eastward. The Cherokee, a converted minesweeper 125 feet in length, was headed westward unencumbered. Both vessels drew in the neighborhood of 9 feet of water. Both were adequately manned and neither was unseaworthy in any respect here material.

As the Suwannee was first seen by Mock she was coming under the influence of the tides running out of the Rigolets, a deepwater tidal channel connecting Lake Pontchartrain and Lake Borgne. He was then one-half mile distant from the Suwannee which, as he surmised, in an effort to counteract the tendency of the current to drive the barge to the south of the channel, was flanking down the channel, that is to say, instead of moving in a straight course in relation to the axis of the channel, it was headed diagonally across the entire channel.[1] No passing signals were given by either craft until, when they were 400 yards apart, Mock gave a single blast, signalling a port to port passage. No reply was received. At that time Mock was holding the Cherokee's course at the extreme northern side (the right hand side for her) of the channel as marked by buoys. He continued at a speed of six miles an hour, although the Suwannee headed even more in a northerly direction, until, when 400 feet away, Mock blew a danger signal and then reversed his engines and turned sharply to the right. This placed Cherokee across the right bow of the barge, which crushed the hull of the Cherokee, which was then beached to prevent sinking. This collision took place 200 feet east of nun buoy 48 which, according to the chart, marks the east end of the dredged channel, so that for approximately the next mile there is deep tidal water before the dredged channel commences again. During the entire distance from the Cherokee's first sighting of the Suwannee there was open water 15 to 19 feet in depth, both north and south of the marked channel. Mock testified that his craft had left the Rigolets Range (a line down the middle of the waterway) and was proceeding along the northern limits as marked by the buoys. He said the Cherokee could "turn" in her own length of 125 feet. Mock testified that he had traversed these waters before and had navigated the Rigolets; he also stated that he had run aground on a spoil bank on the northeast bank of the Rigolets; that he was navigating by the ranges rather than by chart and that he expected the Suwannee to let the head of her tow "fall off" to the right or south in order to make the port to port passage. When asked on cross-examination why, when he saw the Suwannee angling to the north, as she proceeded eastward, he didn't run up the Rigolets to get out of the way of the other vessel, Mock said: "Because I ain't got no habit of running from people in the channel."[2]

---

1. Mock testified that he understood this procedure was necessary and that he would have followed the same course.

2. Pertinent parts of this testimony follow:
"Q. Now, Captain, when you saw him holding up into the channel, why couldn't you have run up the Rigolets and gotten out of his way? You were a light boat? A. Right.
"Q. Why couldn't you do that? A. Because I ain't got no habit of running from people in the channel.

The court, accepting completely the testimony of appellee's witnesses, as we have done here, found the Suwannee at fault; that any fault which does rest with the Cherokee was "minor, indeed venial, compared with the grievous fault of the Suwannee," 139 F.Supp. at 551, and entered a decree for the libelant.

Appellants here complain that the accepted version of the collision demands a reversal because they say that any fault of the Suwannee was a condition and not the cause of the collision or that such fault was minor as compared to that of the Cherokee, and therefore to be excused under the "Major-Minor Fault Rule;" that the Cherokee had the last clear chance to avoid the collision; and that the collision resulted from the sole fault of the Cherokee.

Entirely aside from any rules of admiralty law, it must be apparent that under the rules of common sense this is an accident that should not have happened. Here is an end-on collision which took place because one tug encumbered by pushing a 240-foot barge diagonally down a 150-foot dredged waterway at six to seven miles an hour, comes out into open water where it is struck by another tug fully aware of this situation, proceeding unencumbered in the opposite direction at a point where there is ample depth on both sides of the craft for a safe passage to be made. That such deep water is available up the Rigolets is not only apparent from the charts of the area but it is also indicated by a break in the line of buoys that mark the waterway where it follows the dredged channel. Electing, rather than to turn to the north outside of the prolongation of the dredged channel (although perfectly safe to do so), to hold to its own course within the narrow confines of the marked waterway the light tug maintained its collision course in the expectation that the flotilla consisting of a 75-foot tug and a 240-foot loaded barge, would "fall off" to the south to permit a port to port passage. There is no evidence to show how quickly or with what degree of safety the east bound tug could accomplish this maneuver. The current which would be expected to carry the bow of the barge off to the right or south was only a half mile per hour, according to Mock.

In light of Mock's testimony that he saw the Suwannee; appraised her maneuver for what it was and thought that it was a proper maneuver; and in light of the availability of ample deep water to his right for him to make the port to port passage for which he had signalled and in view of his maintaining his speed until after he sounded his danger signal, at which time the most he could hope for, according to his testimony, was a

"Q. But you could have done it? A. No.

"Q. Why couldn't you? A. Could have left the channel and gone way out of the channel, when, by Heck, that was our course, taking it here (indicating chart) to get to New Orleans.

"Q. But, Captain, to avoid a collision, couldn't you have run into the Rigolets? A. How did I know he was going to run over me.

"Q. You saw him, you testified, blocking the channel. A. He was coming down side—the south side—coming this way. He didn't have the whole channel blocked.

"Q. Angling to your side? A. Yes.

"Q. But you didn't run out of the channel into the Rigolets, which you could have done? A. I did do it, steered out the channel.

"Q. Couldn't you have run further to the north to the Rigolets? A. I suppose when I saw him coming I could have turned and run way off here and probably went aground.

"Q. Well, Captain, look (indicating chart)—there is plenty of water up here for you to run, isn't there? A. Yes.

"Q. You wouldn't have gone aground in 27 or 21 or 18 feet, would you? A. Well, I tell you—

"Q. Answer that question, would you? A. I am going to answer.

"Mr. Mitchell:

I object to counsel arguing with the witness.

"Mr. Matthews:

The witness is arguing with counsel, not counsel with the witness.

"A. On the rules—there is the ranges —he knew the rules and regulations the same as anybody else is supposed to know them."

glancing blow when the craft came together, we are inevitably forced to the conclusion that the Cherokee was stubbornly held to a course which her navigator thought he was entitled to until too late to prevent a collision. In doing this he ignored the most basic rule of all:

"Sailing rules were ordained to prevent collisions between ships employed in navigation, and to preserve life and property embarked in that perilous pursuit, and not to enable those whose duty it is to adopt, if possible, the necessary precautions to avoid such a disaster, to determine how little they can do in that direction, without becoming responsible for its consequences, in case it occurs." The America, 92 U.S. 432, 23 L.Ed. 724.

Obviously it would be improper for a tug to push a barge through a narrowly confined canal in such manner as would preempt the entire waterway. Even if it did so, however, under the need to prevent its running aground this would be no excuse for another vessel approaching it in full clear daylight to proceed without reducing speed into an end-on collision merely because of its right to passage. Much less is this so in an open waterway as here. By the time the Suwannee met the Cherokee its tow had passed out of the dredged part of the waterway and was in open water which bespoke for it the assumption that the port to port passage signalled by the Cherokee would be completed by the latter craft's going north of the line of the waterway to effect it. But if such an assumption was not proper for the Suwannee to make, it nevertheless was in its awkward and improper position not through whim or caprice, but because of a necessary maneuver, whereas nothing but blind insistence on a right of way can explain the placing of the Cherokee in its position of peril. The Cherokee clearly had the last clear chance to avoid the collision. The Cornelius Vanderbilt, 2 Cir., 120 F.2d 766; The Sanday, 2 Cir., 122 F.2d 325.

■■ Whether this be called an application of the doctrine of last clear chance or the rule of causation, makes little difference. Where, as here, an act is negligent, but is not the proximate cause of the injury, it is merely a condition. As such it is not a basis of liability. P. Dougherty Co. v. United States, 3 Cir., 207 F.2d 626.

■■ We find no basis in the record for the finding of the trial court that the water outside the channel at the place of the meeting was shoal or that "spoil banks proliferate in Lake Borgne" at that place. The chart shows, to the contrary that there was ample maneuvering room in deep water at the very place where the collision took place; moreover, the fault of the Cherokee in not reversing engines in time to avoid a collision when her navigator was in constant awareness of the relative position of the two craft was grave indeed. As stated in Postal Steamship Corp. v. El Islco, 308 U.S. 378, 387, 60 S.Ct. 332, 336, 84 L.Ed. 335.

"The plain purpose of the Inspector's Rules is to minimize the danger of collision. The so-called privileged vessel has no absolute right to keep her course and speed regardless of the danger involved in that action. Her right to maintain her privilege ends when there is danger of collision and in the presence of that danger both vessels must be 'stopped and backed if necessary, until signals for passing with safety are made and understood.' "

See also The George S. Tice, (New York & Albany Lighterage Co. v. Davis; Sargent Barge Line Inc. v. Davis), 2 Cir., 287 F. 127. The Cutler, D.C.N.Y., 58 F.Supp. 864, aff. p.c. 2 Cir., 147 F.2d 545.

It seems clear that Mock, the navigator of the Cherokee, gave the real explanation as to why he did not take the simple action that would have prevented the destruction of his craft. He simply determined that he would not veer from the direct course to New Orleans by so

much as the width of his vessel and he didn't propose to give up his right of way.

The damage to the Cherokee is attributable entirely to this gross fault on the part of her navigator. The trial court erred in giving a decree for the libelant. The judgment is Reversed and Remanded with the directions that a decree be entered for respondent, the appellant here.