UNIVERSE TANKSHIPS, Inc., as Owner of THE ORE CHIEF, Libelant,

v.

THE MUNGER T. BALL, her engines, boilers, etc., and Sabine Transportation Company, Respondent.

No. 2573.

United States District Court
S. D. Alabama, S. D.

Dec. 11, 1957.

George F. Wood (of Pillans, Reams, Tappan, Wood & Roberts), Mobile, Ala., for libelant.

T. K. Jackson, Jr. (of Armbrecht, Jackson, McConnell & DeMouy), Mobile, Ala., for respondent.

THOMAS, District Judge.

The libelant, owner of the S.S. Ore Chief, a cargo vessel of 60,000 tons gross, instituted this action in admiralty against the Steam Tanker Munger T. Ball, claiming that the Ore Chief was crowded out of the channel and caused to run aground and sustain severe damage as a result of the Munger T. Ball's improper navigation. The grounding, which is non-disputed, occurred about three o'clock in the early morning of April 22, 1955, on the eastern bank or edge of Mobile Bay outer-bar ship channel. The Ore Chief, at the time of her grounding, ran over and sank outer-bar buoy No. 6.

The Munger T. Ball denied that she was in any way responsible for the Ore Chief's grounding, claiming that her navigation was as prudent as the circumstances would permit, that she had left the confines of the channel before the Ore Chief entered therein, that she did not even have knowledge that the Ore Chief had grounded until many days thereafter. Respondent answered additionally, on information and belief, that the Ore Chief's own faulty navigation, without reference to the navigation of the Munger T. Ball, was the proximate cause of her grounding.

## Findings of Fact

### I

The S.S. Ore Chief, a Liberian Flag Vessel, having a length of 794 feet, a beam of 116 feet and a cargo carrying capacity of 60,000 tons, arrived in sight of the navigational aids outlining the boundaries of the Mobile Bay outer-bar ship channel sometime prior to 0148 a. m. April 22, 1955. The vessel was laden with 20,000 tons of iron ore and 2,000 tons of ballast. She was enroute from Puerto Ordaz, Venezuela, to the Port of Mobile, Alabama, which is reached from the open waters of the Gulf of Mexico by transiting the Mobile Bay outer-bar ship channel, and thence the ship channel within the bay itself. The seaward end of the outer-bar ship channel lies some 30-odd nautical miles south of the Port of Mobile.

### II

The outer-bar ship channel at the time of this occurrence was a dredged channel 450 feet wide extending from the mouth of Mobile Bay southwardly into the Gulf of Mexico a distance in excess of 2 miles. The channel runs generally in a north-south direction and the boundaries are marked by a series of buoys on both the eastern and western banks of the channel. Some of the buoys are lighted, some are not. The No. 1 buoy, or sea buoy, does not mark either side of the channel but is a fairway buoy located approximately ½ mile southwardly from the seaward end of the dredged channel.

### III

John W. Miller, a duly licensed pilot of the Mobile Bar Pilot's Association, boarded the Ore Chief at 0225 a. m. At that time she was somewhat to the south and east of the sea buoy. When she began her approach to enter the dredged channel at 0240, she had drifted and maneuvered to a position where she was somewhat north and east of the sea buoy and approximately ½ mile southeast from the seaward end of the dredged channel.

### IV

Pilot Miller had been aboard the Ore Chief for 15 minutes before starting his approach to the channel entrance. During this entire interval he was aware that the Munger T. Ball was navigating in the channel headed for sea. Pilot Miller and Captain Maxey of the Ore Chief saw that the Munger T. Ball's range lights were open in such fashion as to indicate that she was steering a course to the westward of the axis of the channel but they did not attribute this maneuver to the existence of a strong cross current acting on the Munger T. Ball. The wind was from the southwest about 15 miles per hour, and the visibility was good.

### V

As the Munger T. Ball, a tanker with a length of 440 feet, breadth of 59.2 feet, in light draft but taking on ballast, navigated through the outer reaches of the dredged channel, she was making approximately 12 knots and was compelled to steer a course of from 8 to 13 degrees to the west of the axis of the channel in order to counteract the effect of the easterly cross current. The Munger T. Ball maintained her own starboard side of the channel as much as was reasonably practical under the circumstances. Shortly before reaching the end of the dredged channel, the Munger T. Ball blew a one blast whistle signal. This was answered by a like signal from the Ore Chief which had then begun her approach to the channel entrance.

### VI

There was a strong current setting across the channel in an easterly direction, variously estimated at from two to four knots and probably close to three knots. The pilot and master of the Ore Chief admittedly were unaware of the existence of this strong easterly current and took no measures to counteract the effect thereof as the Ore Chief approached and entered the dredged channel. Nor did the Ore Chief blow a danger signal or otherwise indicate to the Munger T. Ball that the latter was partly on the

Ore Chief's side of the channel, as libelant sought to establish at the trial.

## VII

The Ore Chief was making between 6 and 10 knots, but probably not over 8 knots at the time she entered the channel. There was an unexplained entry in her engine room bell book showing a standby order to the engines approximately one minute before she entered the channel. The strong easterly current forced the Ore Chief against the eastern bank from which position she was unable to recover; and, after sliding along the bank for a considerable distance, she ran over and sank Buoy No. 6 and fetched up hard aground.

## Discussion

While some of the testimony was by deposition, much of it was before the court, including that of the pilots and masters of both vessels. The testimony was highly conflicting in regard to some of the material facts, especially in regard to the physical location of the vessels with respect to the channel and with respect to each other.

■ The testimony of libelant's master and pilot was not persuasive to the extent that it departed in several instances from their testimony before the Coast Guard (The Abangarez, D.C., 60 F.2d 543; The Munalbro, D.C., 280 F. 224), and was otherwise in conflict with the testimony of respondent's master and pilot; and since libelant's case is dependent in large measure on the testimony of its pilot and master, libelant has not sustained the burden of proof to which it was cast. See The Silverfir, 1940 A.M.C. 1530, wherein the facts are similar to these. See also Gulf Oil Corporation v. The Patsy Chotin, D.C., 131 F.Supp. 489, 1955 A.M.C. 1873, and Sword Line, Inc., v. United States of America and Mississippi Shipping Company, D.C., 134 F.Supp. 460, 1955 A.M.C. 1609.

■ Entirely apart from any questions touching on the alleged improper navigation of the Munger T. Ball, the evidence shows faults on the part of those in charge of the Ore Chief's navigation, which faults in themselves were amply sufficient to have caused her to run aground. Being unaware of the strong current setting across the channel to the eastward, the Ore Chief was unprepared to deal with it, in that she did not attain sufficient speed before entering, although she had ample opportunity to do so. Moreover, she entered the channel at an angle, when the prudent maneuver would have been for her to pass the sea buoy close aboard and line up on the channel range. While the current was stronger than usual, it was not a phenomenon of such rarity that it should not have been anticipated by those in charge of the Ore Chief's navigation. In fact, one expert witness said that such conditions could be found to exist on two or three days out of the month.

Of considerable significance too, was the testimony of Captain Adams, who was the only member of the Pilot's Association to testify, other than the pilots of the respective vessels. Captain Adams was initially called as a fact witness but gave expert testimony, albeit reluctantly, to the effect that the Ore Chief should not have attempted to enter the channel in face of the cross current and while a seaward-bound vessel like the Munger T. Ball was in the outer reaches of the dredged channel. On the basis of the testimony of her own master and pilot, coupled with that of Captain Adams and Captain Holmes, an expert produced by respondent, it is apparent that the Ore Chief's grounding was caused by the strong cross current, the possibility of which her pilot should have anticipated. See Homer Ramsdell Transportation Company v. Compagnie Générale Translantique, 2 Cir., 63 F. 845.

■ If the stern of the Munger T. Ball was at times extending over the centerline of the channel, it was due to a necessary and proper maneuver to counteract the effect of the current. This was not such a violation of the Narrow Channel Rule (33 U.S.C.A. § 210, Art. 25) as to impose liability. Thurston Craw-

ford d/b/a River Transit Company v. Indian Towing Company, 5 Cir., 240 F.2d 308, 1957 A.M.C. 250.

### Conclusions of Law

#### I

The Court has jurisdiction of the subject matter and the parties.

#### II

The burden of proof was on libelant, which it failed to carry.

#### III

The Munger T. Ball was free from fault which caused or contributed to the Ore Chief's grounding.

#### IV

The libel should be and hereby is dismissed with costs against libelant.