SARGENT LINE CORPORATION, Libellant,

v.

TUG POTTSVILLE, Reading Company, Claimant,
and
TUG WILMA S., Peerless Oil & Chemical Corporation, Claimant.

M.T.C. CORPORATION, Libellant,

v.

TUG POTTSVILLE, Reading Company, Claimant,
and
Tug Wilma S., Martin T. Carey, Claimant-Impleaded.

United States District Court
S. D. New York.

Jan. 3, 1963.

Mahar & Mason, New York City, Frank C. Mason, New York City, of counsel, for Sargent Line Corp.

Anthony B. Cataldo, New York City, for M. T. C. Corp. and Tug Wilma S. and her claimant.

Macklin, Speer, Hanan & McKernan, New York City, John C. Hart, Gerald J. McKernan, New York City, of counsel, for Reading Co.

DAWSON, District Judge.

This trial involves the consolidation of two admiralty actions both of which concern the same collision. The barge WILLIAM C. DOWNING, while in tow of the tug POTTSVILLE, collided with the barge MARY T. CAREY, while in tow of the tug WILMA S. The collision occurred at about 8:45 P.M. on the evening of July 11, 1961 in the East River, approximately 250 feet off the India Street dock on the Brooklyn shore.

One action is by Sargent Line Corporation, as owner of the barge WILLIAM C. DOWNING, against the Reading Company, as owner of the tug POTTSVILLE, and the Peerless Oil & Chemical Corporation, as charterer of the tug WILMA S. The second action is by the M.T.C. Corporation, as owner of the barge MARY T. CAREY, against the Reading Company as owner of the tug POTTSVILLE. Reading Company thereafter impleaded Martin T. Carey, as owner of the tug WILMA S. Both suits having been consolidated, the question before the Court is the relative fault of each tug.

*Facts*

As to the following facts no substantial dispute exists:

The POTTSVILLE is 104.2 feet in length, 26.1 feet in width, has an engine of 1600 horsepower, was built in 1952 and was under the command of Captain Pero at the time of the accident.

The tug WILMA S. is 57.4 feet in length, 26.1 feet in width, has an engine of 110 horsepower, was built in 1926 and was under the command of Captain Hansen at the time of the accident.

On the evening of July 11, 1961 the POTTSVILLE was in Newtown Creek. Its assignment was to secure the unloaded coal barge WILLIAM C. DOWNING (hereinafter DOWNING) and proceed with it to Hudson Avenue where another barge was waiting to be picked up. The DOWNING, rather than being towed, was attached to POTTSVILLE'S starboard side. Its bow extended well beyond the bow of the tugboat. A notation in the log book of the POTTSVILLE indicates that it left the Sugar Plant at Pidgeon Street at the mouth of Newtown Creek at 8:35 P.M.

Newtown Creek is a narrow stream that flows west between Brooklyn and Queens and empties into the East River. The two bodies of water converge at the Greenpoint section of Brooklyn. The creek makes a fairly sharp turn to the south as it meets the East River so that a ship would be heading southwest as it passed from the center of the creek into the river. The POTTSVILLE and the DOWNING entered the East River from Newtown Creek, turned to port and headed downstream toward Hudson Avenue.

At the same time the tug WILMA S. was transporting the barge MARY T. CAREY (hereinafter CAREY) upstream in the East River. The CAREY was loaded with isopropyl alcohol and was attached to the port bow of the WILMA S. The two vessels were headed for the dock of the Peerless Oil & Chemical Corpora-

tion on the north shore of Newtown Creek. Captain Hansen was following a course that kept him 350–400 feet off the ends of the piers on the Brooklyn shore as he headed north.

The sun had not set at the time of the accident and the visibility was good. The water was not rough and the tide was flooding, which favored ships heading upstream. The WILMA S. was moving at her top speed which was about 5–6 miles per hour. The POTTSVILLE is capable of greater speed and was moving downstream at about 8–12 miles per hour.

The accident occurred off the India Street pier on the Brooklyn shore. When the POTTSVILLE emerged from the creek and entered the East River the boats were about one-half mile apart. This is the earliest time that the captain of either boat could have had the other under his observation. Previous to that the POTTSVILLE was actually in Newtown Creek and thus out of sight of the WILMA S. The two boats had a closing speed of approximately 15 miles per hour and each captain therefore had two to three minutes to sight the other boat, signal it and adjust his own course.

Captain Hansen of the WILMA S. testified that he saw the POTTSVILLE emerge from Newtown Creek and describe an arc that first carried it in a southwest direction toward the Manhattan shore and then further along on that arc toward the Brooklyn shore in a southeast direction. He testified that he blew a single blast on his whistle to indicate a port to port passage and repeated that signal thirty seconds later when he received no answer. He asserts that he again received no answer, and finding the POTTSVILLE bearing down upon him, swung his boat to starboard but was too late and too slow to avoid the collision. The starboard bow corner of the DOWNING struck the port side of the CAREY as the latter swung diagonally in front of the POTTSVILLE. This version of the accident was fully corroborated by a deckhand of the WILMA S. who was on the

bow of the tug and saw the events leading up to the collision.

Captain Pero of the POTTSVILLE testified that he turned his tug sharply to port as it left Newtown Creek and entered the East River. He states that his course was 250–300 feet off the Brooklyn docks which placed him inside of, or east of, the WILMA S. It seemed clear to him that the vessels would execute a starboard to starboard crossing since there was about 100 feet of water between them in an east-west line. He testified that suddenly and without any apparent reason when the two tugs were about 150 feet apart in a north-south line the WILMA S. swung to starboard which carried it in front of the oncoming tug and barge. Captain Pero maintains that he then blew the danger signal and threw his engines into reverse but the barges nevertheless collided. The danger whistle did serve to alert the crewmen on board the POTTSVILLE but they were too late to observe the moment of impact.

We have, therefore, a situation where the WILMA S. thought that the ships would make a port to port passage while the POTTSVILLE thought they would make a starboard to starboard passage. In such a situation the employment of appropriate signals by the respective ships became of supreme importance.

The captain of the WILMA S. gave the appropriate signal blast indicating a port to port passage and when he received no answer from the POTTSVILLE repeated that signal 30 seconds later. He did not receive any response to that signal. What did he then do? He saw the POTTSVILLE bearing down on him apparently oblivious of his signals. He did not stop; he did not sound the danger signal. Having given the port to port signal he apparently was determined that come what may he would continue on that course and he swerved rapidly to starboard to keep on that course, thereby putting himself in front of the POTTSVILLE, and a collision ensued.

But what did the POTTSVILLE do? The captain of the POTTSVILE testified that he thought there was sufficient space

between the ships so that if each kept on course they could make a starboard to starboard passage. He apparently intended to make such passage but gave no signal to that effect. There can be no doubt that the ships were rapidly approaching each other nearly end on in a relatively narrow stretch of water. A signal certainly was indicated under those circumstances. When the WILMA S. indicated by her signal that she intended to pursue a port to port passage the captain of the POTTSVILLE made no response to that signal. He gave no indication at any time that he was intending a starboard to starboard passage. Doggedly he kept on his path, neither giving a signal of his own nor responding to the signal of the other ship. The situation therefore was ripe for a collision and a collision ensued.

### Discussion

■ There is no absolute rule that requires ships to stay toward the starboard shore when navigating the East River. The necessities of commerce on waters as busy as the East River require navigation in every conceivable direction. City of New York v. American Export Lines, 131 F.2d 902 (2d Cir., 1942); The Hygrade No. 12, Inc. v. The Talisman, 153 F.2d 52 (2d Cir., 1946). No fault attaches to the POTTSVILLE simply because it was on the Brooklyn side of the river.

Article 18 of the Inland Rules, 33 U.S. C. § 203, does impose obligations on ships that pass in inland waters. There is no dispute between the parties as to the applicability of these rules to the collision.

"Rule I. When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other.

"But if the courses of such vessels are so far on the starboard of each other as not to be considered as meeting head and head, either vessel shall immediately give two short and distinct blasts of her whistle, which the other vessel shall answer promptly by two similar blasts of her whistle, and they shall pass on the starboard side of each other. .

"The foregoing only applies to cases where vessels are meeting end on or nearly end on, in such a manner as to involve risk of collision; in other words, to cases in which, by day, each vessel sees the masts of the other in a line, or nearly in a line, with her own * * *.

> \* \* \* \* \* \*

"Rule III. If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle."

■■ Rule I of Article 18 clearly dictates the correct manner of passage. It is not in any sense optional, nor does the rule permit any deviation from its express requirements. Its terms are precise and mandatory. The controlling factor is the position of the ships. If they are meeting end on, or nearly so, there must be a port to port passage. Only if they are meeting so far on each other's starboard as to not be within the statutory definition may a starboard to starboard passage be effectuated. The Transfer No. 10, 137 F. 666 (D.C.S.D. N.Y.1904); The Donau, 49 F.2d 799 (D.C.W.D.Wash.1931).

■■ In either case, however, a signal is required by the Inland Rules. The drafters of those rules realized that navigation on an inland waterway was such that the respective ships must communicate with each other so that there might be no doubt in the mind of either of them of the path to be taken. The WILMA S.,

which had decided on a port to port passage, properly gave a signal of her intention. It was not answered. It thereupon gave another signal of its intention. This was not answered. The Inland Rules would indicate that under such circumstances an answer is a prerequisite to a continuation of the port to port passage. When the two signals were not answered the captain of the WILMA S. must have been in doubt as to whether his signals had been heard by the POTTSVILLE or were going to be followed by the POTTSVILLE. In those circumstances, under Rule III, the WILMA S. was under an obligation to give several short and rapid blasts, "not less than four." To continue on its course without receiving a response to its signal was negligence. James McWilliams Blue Line v. Card Towing Line, 168 F.2d 720, 721–722 (2d Cir., 1948). To fail to give those several blasts was negligence. To swerve rapidly to the starboard, so as to be certain to continue on the port to port passage, when its signal had not been answered, was also negligence. The Munaires, 1 F.2d 13 (2d Cir., 1924); The Sabine Sun, 21 F.2d 121 (D.C.E.D.Pa.1927); United States v. Grant, 11 F.2d 700 (1st Cir., 1926); Petition of Diesel Tanker A. C. Dodge, 133 F.Supp. 510 (E.D.N.Y. 1955), aff'd, 234 F.2d 374 (2d Cir., 1956), cert. denied, 352 U.S. 928, 77 S.Ct. 227, 1 L.Ed.2d 163 (1956).

However, the POTTSVILLE was not without fault. If the POTTSVILLE thought the signals of the WILMA S. to be inappropriate to the situation, a danger signal should have been sounded and its speed reduced. This would have served to put Captain Hansen on notice that his announced intention met with disapproval. The Colonel Beacon, 77 F. Supp. 109 (S.D.N.Y.1948). If the POTTSVILLE had determined, as the captain testified it had, to pursue a starboard to starboard passage, he was required under the Inland Rules to give "two short and distinct blasts of her whistle," so that an approaching ship might know this was his intention. He failed to give those blasts; he failed to answer the single blast of the WILMA S. Such actions on his part, in failing to give a signal and in failing to respond to the signal of the other vessel, constituted negligence.

■ Navigation of inland waterways presupposes that the captains of approaching vessels shall communicate with each other by complying with the Inland Rules. Failure to do so can only lead to tragic consequences, as it did in this case. The art of communication between ships' captains is as old and well established as it is between players at a bridge table. Except for the lack of communication between the ships' captains, there was no reason for this accident which happened while there was still daylight, on an open body of water. The dogged refusal of the POTTSVILLE to give a signal or to respond to the signals of the WILMA S., and the equally dogged refusal of the WILMA S. to delay its course or give the danger signal when its signals were not answered, both contributed in equal measure to the collision.

### Conclusion

The Court concludes that the collision in this case was the result of the joint negligence of the tugs WILMA S. and POTTSVILLE and that each contributed equally to the fault.

The issue of damages shall be referred to a Commissioner to hear and report to the Court thereon, and the damages shall be borne equally by the two tugs above referred to.

The foregoing opinion shall constitute the findings of fact and conclusions of law of the Court. Submit decree in accordance with this opinion.