NEW YORK CENTRAL RAILROAD COMPANY, as owner of the New York Central, Carfloat No. 43, Libelant,

v.

TEXACO INC. and S/S TEXACO SOUTH CAROLINA, Respondent.

TEXACO INC., as owner of the tanker Texaco South Carolina, Cross-Libelant,

v.

TUG NEW YORK CENTRAL #32, New York Central Carfloat #43 and The New York Central Railroad Company, Cross-Respondents.

United States District Court
S. D. New York.
Jan. 16, 1964.

Gerald E. Dwyer, New York City, for New York Central Railroad Co.; William F. McGinn, Edward J. Degnan, New York City, of counsel.

Brush & Brush, New York City, for Texaco Inc.; Joseph M. Brush, New York City, of counsel.

FEINBERG, District Judge.

These are cross-libels in admiralty arising out of a collision in the East River in the early morning of July 31, 1961, between the South Carolina, a T–2 tanker owned by Texaco, Inc., and a carfloat in tow of the tug No. 32, both of which are owned by the New York Central Railroad. The South Carolina was proceeding downstream and the tug was proceeding upstream when the collision occurred. The libels were consolidated for trial.

I conclude for the reasons stated below that both the Texaco South Carolina and the New York Central tug No. 32 ("Tug 32") were at fault, and that, consequently, the damages should be divided equally.

Tug 32 left the float bridges at 68th Street and the Hudson River at about 0030 on July 31, 1961, bound for the Long Island Railroad terminal which is on the Brooklyn shore of the East River above Newton's Creek. She carried carfloat No. 43 in tow on her port side and carfloat No. 63 in tow on her starboard side. Tug 32, built in 1923, is a single-screw ship equipped with her original engines which have a rated horsepower of 750. It is 108 feet long, 25 feet 6 inch beam, and had a draft of four feet amidships on departure. The carfloat No. 43 is 257 feet long, 40.1 feet beam, and, loaded with railroad cars on departure, had a draft of four feet. The carfloat No. 63 is 366.3 feet long, 38.2 feet beam, and also loaded with railroad cars, had a draft of 4 feet 8 inches.

The carfloats were secured to the tug by side lines and stern lines and to each other by a cross line at their bows. The bows of the carfloats pointed at each other ahead of the tug and their sterns flared out, forming an inverted "V." Carfloat No. 43, on the port side of the tug, extended about 150 feet ahead of the tug, and its stern was about even with the stern of the tug. Carfloat No. 63, on the starboard side, extended about 180 feet ahead of the tug and 30 feet ahead of carfloat No. 43, and its stern projected about 80 feet beyond the stern of the tug. The tug was properly exhibiting red and green side lights, two white staff lights, a headlight, and each float carried a kerosene lantern on its forward and after outboard corners.

From the float bridges, Tug 32 proceeded down the Hudson River, rounded the Battery, and then headed up the East River along the Manhattan shore. The tide was ebbing at about four miles an hour. The weather conditions and visibility were very good. It was a warm and clear moonlit night with a light wind. As Tug 32 approached the vicinity of Piers 33–34–35 on the Manhattan Shore, she blew a passing signal to the tug All American and tow, owned and operated by Texaco, which was further ahead and also proceeding upstream, but at a slower rate and about fifty feet further out toward midstream.[1] Receiving no response to her signal, Tug 32 crossed over to the Brooklyn side of the river by "jockeying" her floats across, that is, by swinging a little to port, and then to starboard, and to port again, as the tide conditions required, in order to retain control of her tow.[2]

A few minutes after Tug 32 arrived on the Brooklyn side of the East River, the Texaco South Carolina, which was head-

---

1. Transcript, p. 60. [Transcript hereinafter referred to as "Tr."]

2. Tr. pp. 61–62.

ing downstream enroute from New Haven, Connecticut to Bayonne, New Jersey, passed under the Williamsburg Bridge. The South Carolina, a single-screw tanker, is 504 feet long, 68.2 feet beam, 39.2 feet deep, with a gross tonnage of 10,551. On the morning of the collision, she was partly loaded with a cargo of petroleum products, had a draft of 11 feet 4 inches forward and 25 feet 10 inches aft, and displayed all the usual navigation lights.

The New York Central called three witnesses: Captain Drago, master of Tug 32 on the morning of the collision; Mr. Hughes, first deckhand on Tug 32; and Captain Pickens, master of the tug Dalzell No. 3 (owned and operated by the New Haven Railroad), which was towing a pair of carfloats along the Brooklyn shore of the East River—astern of Tug 32 and further inshore—when the collision occurred. Two witnesses testified for Texaco: Captain Wardlaw, pilot of the Texaco South Carolina on the morning of the collision; and Captain Johnson, master of the Texaco tug All American, which was heading upstream with a barge in tow on the Manhattan side of the river a little below Corlears Hook at the time of the collision.

As to the positions and headings of the vessels in the interval between the time Tug 32 arrived on the Brooklyn side of the river and the time of collision, the testimony of the Texaco and New York Central witnesses are in substantial conflict. In dispute are (a) the distance between Tug 32 and tow and the Brooklyn pier ends as she proceeded upstream; (b) whether Tug 32, as she headed upstream, proceeded parallel to the Brook-

lyn shoreline or, alternatively, angled out toward midstream; (c) the signals sounded by each of the vessels and the times at which they were sounded; and (d) the point of collision.

■ (a) Drago, master of Tug 32, testified that he approached the Brooklyn shore in the vicinity of Jay Street[3] and then headed Tug 32 upstream parallel[4] to and about 200 feet[5] from the Brooklyn pier ends at a speed of about two knots over the bottom. Hughes, first deckhand on Tug 32, estimated the distance from the Brooklyn shore at Jay Street to be about 150 feet.[6] Wardlaw, who was piloting the South Carolina, stated at the trial that, as the South Carolina passed under the Williamsburg Bridge, he first sighted Tug 32 about 400 feet off the Brooklyn shore in the vicinity of Jay Street[7] (along with the Dalzell which was astern of Tug 32 and further inshore). At the Coast Guard hearing, however, Wardlaw testified that when he first observed the tugs he "thought maybe they might be taking on or discharging railroad barges at this pier * * *."[8] At the trial, he admitted that from the center of the Williamsburg Bridge "it's impossible to tell * * * how far off [a vessel is from the Brooklyn shore in the vicinity of Jay Street] * * * or what the distance is until you get somewhere near a plumb."[9] Johnson, master of the All American, who was on the Manhattan side of the river (at about Pier 44),[10] heard Tug 32 sound one blast shortly after crossing over, and stated that at that time Tug 32 appeared to be "about in the middle of the river."[11]

3. Tr. p. 60.

4. Tr. pp. 100–01.

5. Tr. p. 73. Unless otherwise indicated, the distance of the New York Central tug No. 32 and tow from the Brooklyn shore is given in number of feet from the starboard corner of the stern of carfloat No. 63 to the Brooklyn pier ends.

6. Tr. p. 148.

7. Tr. pp. 306–07.

8. Tr. p. 324. Testimony given by a witness before the Coast Guard is admissible in an admiralty trial for the purpose of impeaching the witness' credibility. Cf. The Abangarez, 60 F.2d 543 (E.D.La. 1932).

9. Tr. p. 326.

10. Tr. p. 224.

11. Tr. p. 223.

Pickens, however, who was then piloting the New Haven tug Dalzell about 75 feet off the Brooklyn shore [12] and several hundred feet astern of Tug 32,[13] estimated the distance to have been about 100 feet.[13A] Pickens' testimony fortifies the estimates of 150 to 200 feet given by Hughes and Drago who had no reason to *over*state their distance from the Brooklyn shore and who were in the best position to know the facts.

I find that Tug 32 and tow approached the Brooklyn shore in the vicinity of Jay Street and began heading back upstream at a distance not greater than 200 feet from the Brooklyn pier ends.

(b) The testimony of Drago [14] and Hughes [15] that Tug 32 was at all times parallel to the Brooklyn shore as she proceeded upstream, however, cannot stand against the overwhelming evidence to the contrary. The tide, at its ebb, sweeps down from Corlears Hook and sets onto the Brooklyn side along the shore from the Consolidated Edison Hudson Avenue powerhouse to about Jay Street, and then sets back onto the Manhattan shore in the vicinity of the Brooklyn Bridge.[16] On the morning of the collision, the tide was running at almost full strength (about four knots). Hughes admitted on cross-examination that in order to counteract the effect of the tide, Drago had to "keep his wheel to the left." [17] Wardlaw, who was heading downstream on the South Carolina, testified that as he passed Pier J Tug 32 was showing its red and green lights,[18] and that the opening up of its green light indicated to him that she was "to some extent cross-wise in the

river * * * and heading across over to the Manhattan side." [19] Johnson, who was on the Manhattan side of the river and a little farther upstream than Tug 32, said that he saw Tug 32 angling toward him (but showing only its red light).[20] And Pickens, who was several hundred feet astern of Tug 32, testified on cross-examination that Tug 32 had to angle out "in order to keep from hitting back on the stern." [21] The diagrams drawn by Johnson [22] and Wardlaw [23] of the angle of collision indicate that at the time of collision the port carfloat (No. 43) of Tug 32 was approximately at a 45 degree angle with the center line of the river. Wardlaw also testified to this effect.[24]

I find that Tug 32, in attempting to counteract the strong tide setting in on the Brooklyn shore between the powerhouse and Jay Street, turned to port and angled out towards midstream as she proceeded upriver, and that the port carfloat of Tug 32 collided with the South Carolina at an angle of about 45 degrees with a line parallel to the center line of the river.

(c) Drago testified that two to five minutes after he arrived on the Brooklyn side of the river, he discovered the range lights and the starboard light of the South Carolina under the Williamsburg Bridge, and immediately blew one long blast of the whistle indicating a port-to-port passing, but heard no signal from the South Carolina other than an alarm signal shortly before the collision.[25] Since Tug 32 was proceeding at about two knots over the bottom, Drago's esti-

12. Tr. p. 263.

13. Tr. pp. 283–84.

13A. Tr. p. 182.

14. Tr. pp. 100–01.

15. Tr. p. 170.

16. Tr. pp. 164–65, 186–87.

17. Tr. p. 171.

18. Tr. p. 317.

19. Tr. p. 332.

20. Tr. p. 224.

21. Tr. pp. 193–94.

22. Texaco Exhibit "D."

23. Texaco Exhibit "E."

24. Tr. p. 299. Pickens did not respond, on cross-examination, to a question as to how far Tug 32 had angled out as she proceeded upstream along the Brooklyn shore. Tr. p. 193.

25. Tr. pp. 72–73.

mate of the time he sighted the South Carolina would place Tug 32 at the time of sighting somewhere between Bridge Street and Gold Street. Hughes was stationed as lookout in the pilothouse that night but said that he did not see the South Carolina until Drago blew the whistle, at which time Tug 32, according to Hughes, was opposite the ouside bulkhead at Marshall Street.[26] Wardlaw, on the other hand, maintained that as the South Carolina passed under the Williamsburg Bridge, he first sighted Tug 32 offshore in the vicinity of Jay Street and blew one blast, but heard no signal from the tug until about thirty seconds before the collision.[27] The testimony of both Johnson and Pickens—the captains of the only other vessels in the vicinity at the time—established the fact that Tug 32 did sound one blast of the whistle to which the South Carolina responded with a one blast whistle of her own, and that a series of whistles and alarms from each of the vessels followed.[28]

I find that the captain of Tug 32 first sighted the South Carolina under the Williamsburg Bridge when Tug 32 was somewhere between Jay Street and Bridge Street, and at that point Tug 32 blew a one blast whistle; that the South Carolina replied with a one blast whistle almost immediately thereafter; that, at Pier J, the South Carolina blew the alarm and another one blast whistle; that Tug 32 then blew an alarm which was followed by an alarm plus a one blast whistle from the South Carolina; and that about thirty seconds before the collision, Tug 32 blew a backing signal and reversed her engines.

(d) As the South Carolina passed under the Williamsburg Bridge, Captain Wardlaw reduced the ship's speed from one-half (about eight knots over the bottom) [29] to slow (about four knots), in order not to create a backwash against the ships docked at the Navy Yard,[30] and ordered a fifteen to twenty degree right rudder, which is the normal rudder angle for swinging the South Carolina around Corlears Hook through the middle of the channel on an ebb tide.[31] Wardlaw testified that the South Carolina was about 500 feet off the Brooklyn shore as he passed Pier J.[32] Since the width of the channel (the navigable part of the river) at this point is approximately 1,250 feet [33] and there are no shoals off Pier J, the starboard side of the South Carolina must have been about fifty feet on the Brooklyn side of the center line of the channel. Wardlaw testified that when the South Carolina reached Pier J, he realized that Tug 32 and tow were "out in the middle of the river," [34] but that he maintained slow speed and did not alter the fifteen to twenty degree right rudder which he had ordered at the Williamsburg Bridge.[35] Some time after the South Carolina passed Pier J—Wardlaw's testimony does not indicate exactly when [36]—he increased the speed to one-half and gave a hard right rudder

26. Tr. p. 150.

27. Tr. p. 327.

28. Tr. pp. 182–83, 210, 252–54.

29. Tr. p. 360.

30. Tr. p. 294.

31. Tr. pp. 263–64, 297.

32. Tr. p. 318.

33. The width of the *river* at this point is 1,410 feet and the shoals off the Manhattan side extend about 150 feet out. Johnson maintained that the shoals at this point extended 300 feet (Tr. pp. 217, 235), but the area he was referring to is clearly several hundred feet further downstream. New York Central Exhibit 1.

34. Tr. p. 331.

35. Tr. pp. 365–66, 368.

36. Wardlaw did testify that when he gave the hard right rudder he "could easily observe the whole float then. There was no more looking at the lights and changing lights or doing anything. You could see what was happening. * * * The float was coming right in." Tr. p. 298.

(thirty-five degrees), but, in his own words, the vessels by then were "too close" to avoid collision.[37] Drago testified that it was "just at the last minute, seconds before the collision, * * * [when the South Carolina] seemed to make a quick turn." [38] Under the circumstances, the most reasonable estimate is that the South Carolina was a distance of, at most, a ship's length from the point of contact when she altered her course.

The witnesses agreed generally that the point of collision was about on a line between Pier 42 on the Manhattan shore and the jetty at the end of Gold Street on the Brooklyn side.[39] The distance between the point of collision and the Brooklyn shoreline, however, was vigorously disputed. It was variously estimated at 300 feet from the Brooklyn shore by Drago;[40] 400 feet from the Brooklyn shore by Pickens;[41] 650 feet from the Brooklyn shore by Johnson;[42] and 400 to 450 feet from the Manhattan shore, which is 850 to 900 feet from the Brooklyn shore, by Wardlaw.[43]

I do not accept either the estimate of Drago or that of Wardlaw, which go to opposite extremes, because their testimony on this point is inconsistent with other evidence which I find more reliable, and because both witnesses, as navigators of the colliding vessels, might well recall facts in the light most favorable to them.

See The S. V. Luckenbach, 197 F. 888 (2 Cir. 1912). The true state of facts appears to lie somewhere in between.

Pickens' estimate of 400 feet from point of collision to the Brooklyn shore is about 100 feet short of the distance computed on the basis of other testimony of his. He testified, for example, that his own tug and tow were about 150 feet from the Brooklyn shoreline.[44] The width of his own flotilla—made up of a tug and a tow on each side[45]—was most probably at least 100 feet.[46] Therefore, the stern of Pickens' port float would have been 250 feet from the Brooklyn shoreline. There is no question that the Dalzell passed Tug 32 after the collision and on the starboard side of Tug 32.[47] Allowing a minimum clearance of fifty feet, this would have placed the starboard stern corner of the New York Central carfloat No. 63 (the starboard float towed by Tug 32) about 300 feet from the Brooklyn shoreline. Had Tug 32 been proceeding parallel to the Brooklyn shoreline at the moment of collision of its port carfloat with the South Carolina, the undisputed dimensions of Tug 32 and its two carfloats would have made the point of contact less than one hundred feet farther outstream. However, carfloat No. 43 towed by Tug 32 collided with the South Carolina at an angle of about forty-five degrees with a line paral-

37. Tr. p. 368.

38. Tr. p. 74.

39. Tr. pp. 125, 255, 357.

40. Tr. p. 73.

41. Tr. p. 185.

42. Tr. pp. 262–63.

43. Tr. p. 369.

44. Tr. p. 185.

45. Tr. p. 180; the New York Central does not dispute the fact that the tug Dalzell had a tow on each side (Texaco proposed finding of fact No. 16 agreed to by New York Central in accordance with the procedure outlined at Tr. p. 398).

46. It is undisputed that the two carfloats towed by Tug 32 were 38.2 feet and 40.1 feet wide, respectively. Taking the smaller figure as the width of the carfloats towed by the Dalzell gives a width of 76.4 feet for the Dalzell's tow. The Dalzell was a much more "powerful" tug than Tug 32 (1,800 hp compared to 750 hp). Tr. pp. 44, 189. Assuming, however, that it was no wider than Tug 32 (undisputed beam of 25'6"), the width of the Dalzell and its tows would be 102 feet. Cf. Tr. pp. 194–95, apparently indicating Pickens' earlier out-of-court estimate of the width of the Dalzell and tow as 150 feet. It is not clear whether Pickens adopted this statement at trial (Tr. p. 195), and it is, therefore, not relied on by the Court as evidence of the width of the Dalzell and tow.

47. Tr. pp. 284–85.

lel to the center line of the river.[48] Consequently, on the basis of rough calculations,[49] I estimate that the point of colli-

sion was about another 200 feet, or a total of approximately 500 feet, from the Brooklyn shoreline, or about one hundred

48. Text accompanying notes 22–24 supra.

49. The estimate is based upon the following diagram and calculations.

The diagram is not drawn to scale but approximates the relative sizes and positions of the vessels.

Since the angle between carfloat No. 43 and a line parallel to the center line of the river (XY) was approximately 45 degrees, and carfloat No. 63 was not lying parallel to No. 43, but was pointed toward it, the angle between No. 63 and XY (EGB) must have been greater than 45 degrees. The angle (DEF) formed by drawing a line (EF) from the starboard

bow corner (E) of No. 63 parallel to XY would have been equal to angle EGB, and, therefore, also greater than 45 degrees. Consequently, the distance between the starboard stern corner of No. 63 (D) and line EF would have been greater than one-half the length of No. 63 (DE), or greater than 183 feet.

The angle between carfloat No. 43 and XY was 45 degrees (HCY), and the width of No. 43 (AC) was forty feet. Consequently, the point of contact (C) was

feet farther out toward midstream than Pickens said it was. Johnson estimated the distance as 650 feet from the Brooklyn shore so that the finding is a figure between Johnson's and Pickens' estimates.

Since the East River is approximately 1,300 feet wide at this point, with 150 feet of shoals on the Brooklyn shore, the collision I find occurred at a point about 225 feet from midchannel, on the Brooklyn side of the river, on an imaginary line from Pier 42 to the jetty at the end of Gold Street.

### I
### Fault of the New York Central Tug 32

■■ The "narrow channel" rule, 30 Stat. 101 (1897), 33 U.S.C. § 210, which requires vessels in such a channel to keep to the starboard when it is safe and practicable, does not apply to the East River between the Battery and Welfare (Blackwell's) Island. The Hygrade No. 12, Inc. v. The Talisman, 153 F.2d 52 (2 Cir. 1946); City of New York v. American Export Lines, Inc., 131 F.2d 902 (2 Cir. 1942). Navigation there was formerly governed by the East River Statute, N.Y.Gen.Laws c. 410, § 757 (1882), which required vessels to navigate as near as possible in midstream. The Bern, 74 F.2d 235 (2 Cir. 1934); The Wrestler, 232 F. 448 (2 Cir. 1916). Since the repeal of the statute in 1937, vessels may go up either side of the river, and the situation is governed only by the Inland Rules relating to steam vessels approaching, meeting, or passing one another. The Hygrade, supra; City of New York, supra; Sargent Line Corp. v. Tug Pottsville, 212 F.Supp. 360, 363 (S.D.N.Y.1963). Thus, the mere crossing of Tug 32 and tow from the Manhattan to the Brooklyn side of the East River was not culpable since the collision occurred some time after she arrived on the Brooklyn side, which she was free to take up initially.[50] The question here is whether, in proceeding up the Brooklyn side, she fulfilled her statutory duties and exercised that degree of diligence required under the circumstances.

■ Article 18, Rule I, of the Inland Rules provides that "[w]hen steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other." 30 Stat. 100 (1897), as amended, 33 U.S.C. § 203. In a winding channel, the test whether two vessels are meeting end on "is not their relative headings when one is in one reach of the channel and the other in the other. Their duties are fixed by [what] their * * * relative headings [would be] if the channels were straight." City of New York, supra, 131 F.2d at 905. In the instant case, the two vessels, at the time they sighted each other, were heading on parallel courses [51] and would have passed each other port-to-port with a clearance of about 200 feet had they maintained their respective courses. Clearly, they were not "head and head or

---

twenty feet farther outstream than the starboard bow corner of No. 43 (A).

Since the starboard bow corner of No. 43 (A) was probably a little farther outstream than the starboard bow corner of No. 63 (E), see New York Central Exhibit "5," the point of contact (C) was at least 203 feet (183 plus 20) farther outstream than the starboard stern corner of No. 63 (D).

50. Even under the "narrow channel" rule, it has been held that navigating on the wrong side of the channel was a condition, rather than a cause, of collision if the position of the offending ship was visible at a sufficient distance and did not impede any precautions necessary to avoid collision, Construction Aggregates Co. v. Long Island R. R., 105 F.2d 1009, 1011 (2 Cir. 1939). However, the violating vessel has been held liable if difficulties of navigation were increased by proceeding on the wrong side. Southern Pac. Co. v. United States, 72 F.2d 212, 214 (2 Cir. 1934); The Benjamin Franklin, 145 F. 13 (2 Cir. 1906).

51. It is the projected course of a vessel—so far as it is ascertainable—that determines its obligations under the rules, and once that course is known, her temporary headings (to counteract the tide, for example) do not alter these obligations in the absence of "special circumstances." See Construction Aggregates Co. v. Long Island R. R., supra note 50, 105 F.2d at 1011.

nearly so." Cf. New York, New Haven & H. R. Co. v. Baltimore & O. R. Co., 236 F.2d 228, 231 (2 Cir. 1956); Construction Aggregates Co. v. Long Island R. R., 105 F.2d 1009, 1011 (2 Cir. 1939). However, the Pilot Rules for Inland Waters, promulgated by the Coast Guard, call for a port-to-port passing in such a situation. 33 C.F.R. § 80.13(c) (1962) (text accompanying diagram of "Second Situation"). In any event, Tug 32 sounded one blast of her whistle which signified the intention and the ability to pass port-to-port, see 33 C.F.R. § 80.03 (1962); The F. W. Wheeler, 78 F. 824, 828–829 (6 Cir. 1897), and receiving an assent from the South Carolina, she was bound to carry out the proposed arrangement. Instead, however, she angled out further toward midstream so that the bow of her port carfloat was about 225 feet from the center line of the channel at the time it collided with the South Carolina. That her movement and position in the river resulted from her attempt to counteract the effect of the tide provides no justification. This is not to say that a vessel may not maneuver to counteract dangerous tidal conditions, but those maneuvers must be necessary and proper, and every reasonable step must be taken to avoid collision with an oncoming ship, see The Galatea, 2, 92 U.S. (2 Otto) 439, 445, 23 L.Ed. 727 (1875); Crawford v. Indian Towing Co., 240 F.2d 308 (5 Cir.), cert. denied, 353 U.S. 958, 77 S.Ct. 865, 1 L.Ed.2d 909 (1957); Universe Tankships, Inc. v. The Munger T. Ball, 157 F. Supp. 237 (S.D.Ala.1957). See also The Wrestler, supra.

In The Harlem River No. 1, 223 F. 537 (2 Cir. 1915), a coal barge in tow of a tug bound down the Harlem River collided with a scow in tow of an upbound tug ("The Wellington") near the New York shore opposite Little Hell Gate. The Court summarized the facts as follows (223 F. at 538):

"The Wellington had to cross the tide running out of Little Hell Gate and, instead of navigating so as to meet the tide bow on, she allowed her tow and herself to swerve to port so that the tide struck the starboard side of the tow, causing both tug and tow to swing across the Harlem River."

This is essentially what occurred in the instant case. In attempting to counteract the tide setting onto the Brooklyn shore by keeping her bow in the tide, Tug 32 came too far to port and exposed the starboard side of her tow to the oncoming tide, which carried her further out toward midstream.[52] The Court in the Harlem River held that (223 F. at 538):

"[T]he testimony strongly supports Judge Veeder's finding that the collision occurred by reason of the careless navigation of the Wellington in permitting the vessels to be caught in the tide at Little Hell Gate and thus to be thrown over onto the New York shore."

A similar conclusion is warranted here. There was nothing unforeseen or sudden about the tidal conditions on the morning of the collision. Captain Drago knew the strength and set of the tide in the vicinity of the powerhouse;[53] he knew the power of Tug 32's engines, and how she responded to handling when bucking a strong tide. All of these were important factors to be considered in navigating the river. See The Britannia, 153 U.S. 130, 135–136, 14 S.Ct. 795, 38 L.Ed. 660 (1894); The Harding Highway v. United States, 53 F.2d 938, 939–940 (3 Cir. 1931). While there was testimony to the effect that it was a proper maneuver to counteract the effect of the tide in the vicinity of the powerhouse by turning to port,[54] the captain of Tug 32 was negligent insofar as he lost control of his floats by turning too far to port[55] and was unable to swing back to starboard against the strength of the tide in order to effectuate the port-to-port passing for which he had signalled. Whether the inability to turn

---

52. Tr. pp. 342–45.

53. Tr. pp. 93–97.

54. Tr. pp. 171, 195.

55. Cf. Tr. pp. 104–05.

to starboard was due to improper maneuvering of the vessel or insufficient power of the tug's engines, or a combination of both, is immaterial since, in any case, there was negligence. If Tug 32 did not have sufficient power to navigate safely against the tide in the vicinity of the powerhouse, then she had no business being over there.[56] There were alternatives available to Tug 32. She could have remained on the Manhattan side of the river until after she rounded Corlears Hook or, having crossed over to the Brooklyn side where she did, she might have stopped and backed and so signalled to the South Carolina.[57] The one wrong way was to propose to pass the South Carolina port-to-port and then proceed to angle out to port heading across the projected course of the tanker.

In view of my conclusion that Tug 32 was at fault because of her failure to properly navigate against the tide, and that her negligence was a proximate cause of the collision, it is not necessary to pass on the Texaco's additional contention that the failure to have a lookout on the bow of the New York Central carfloat was negligent.

## II

### The Fault of the Texaco South Carolina

The Pilot Rules for Inland Waters provide that "one short blast of the whistle signifies intention to direct course to own starboard, except when two steam vessels are approaching each other at right angles or obliquely. * * *" 33 C.F.R. § 80.03 (1962).[58] The fifteen to twenty degree right rudder ordered by Captain Wardlaw as the South Carolina passed under the Williamsburg Bridge and sounded one blast did not constitute an alteration of course, since it was the normal rudder angle for navigating the tanker on its projected course through the middle of the channel around Corlears Hook. However, it is not clear whether an alteration of course to starboard is required when, as in the instant case, the projected courses of meeting vessels are parallel and a few hundred feet apart.[59]

▮▮▮▮ It is not necessary to decide this question since I conclude that the South Carolina was negligent in failing to increase her speed and rudder angle at Pier J when her pilot realized that Tug 32 was out near midstream partially obstructing the South Carolina's projected course. While it may be the custom on the East River for deep draft vessels to navigate in midstream while tugs and small craft keep to either side of the channel, the South Carolina cannot set up that custom as a license to disregard the navigation rules or regulations and produce or assist a collision. "Big vessels may not insolently disregard smaller ones; super size gives no right to domineer." Wilson v. Pacific Mail S. S. Co., 276 U.S. 454, 462, 48 S.Ct. 369, 370, 72 L.Ed. 651 (1928). Assuming *arguendo*

56. The instant case is thus distinguishable from Crawford v. Indian Towing Co., 240 F.2d 308 (5 Cir. 1957). There, a tug was heading diagonally across a dredged channel in order to counteract the tendency of the tide to set it onto the shoals, and collided with a vessel coming from the other end of the channel. The court exonerated the tug under the "last clear chance" doctrine on the ground, *inter alia*, that the navigator of the other vessel had testified that this procedure of heading diagonally across the channel was proper; that it was the only way for the tug, which was pushing a 240 foot loaded barge, to navigate the channel; and that he would have followed the same course. 240 F.2d at 309, n. 1 and 310. The cases are also distinguishable on the ground that in Crawford, the tug did not indicate that it would alter its course to starboard by signalling for a port-to-port passing.

57. See The New York, 175 U.S. 187, 201, 20 S.Ct. 67, 44 L.Ed. 126 (1899), and cases cited therein.

58. Article 18 of the Inland Rules does not specifically require alteration, but has been held to imply alteration of course in a head and head situation, if necessary to avoid collision. The Bridgeton, 1924 A.M.C. 1220 (S.D.N.Y.1924).

59. Cf. 33 C.F.R. § 80.3 (1962), discussed at Southern Transp. Co. v. Dauntless. Towing Line, 140 F.2d 215, 217 (2 Cir. 1944).

that the South Carolina had no duty to alter course to starboard at the time she sounded the first one blast signal at the Williamsburg Bridge, see text accompanying note 59 supra, her right to maintain her course ended when, at Pier J, the danger of collision became imminent.[60] There was ample deep water on the starboard side of the channel for the South Carolina to make the port-to-port passage for which the vessels had signalled. Captain Wardlaw admitted that he saw Tug 32 angling out near the middle of the channel and that he was aware of the dangerous tidal conditions in the vicinity of the collision, but he depended upon Tug 32 to retrieve her fault, refusing to alter the course of the South Carolina—which he thought he was entitled by custom to maintain [61]—until it was too late to avoid collision. "The law gives no countenance to such perversity, but, on the other hand, exacts of each vessel that, notwithstanding the errors of the other, it shall to the end do all in its power to avoid the consequences of the fault." The Mary C. Elphicke v. Pittsburgh S. S. Co., 123 F. 405, 406–407 (6 Cir. 1903). See Crawford v. Indian Towing Co., 240 F.2d 308, 311 (5 Cir. 1957). Neither custom nor convenience will excuse violation of the navigation rules or regulations, cf. The Richard J. Barnes, 111 F.2d 294 (2 Cir. 1940), which were designed to prevent collisions between vessels "and not to enable those whose duty it is to adopt, if possible, the necessary precautions to avoid such a disaster, to determine how little they can do in that direction without becoming responsible for its consequences, in case it occurs." The Amer-

ica, 92 U.S. (2 Otto) 432–433, 23 L. Ed. 724 (1875).

The distance from Pier J on the Brooklyn side to the point of collision is about 2,100 feet or approximately four times the length of the South Carolina. Although it is difficult to estimate with precision the distance that would have been required for the South Carolina to avoid collision under a hard right rudder at half speed since the evidence fails to disclose the turning characteristics of the tanker, it would seem that within a distance of four ship lengths, the South Carolina could have turned sufficiently to avoid collision had she acted promptly. See Admiral Knight's Turning Curves, KNIGHT, MODERN SEAMANSHIP 194 (13 ed. 1960). Consequently, the negligence of the South Carolina in failing to alter her course to starboard when, at Pier J, she realized, or should have realized, that collision was imminent, was a proximate cause of the collision.

This is one of those cases in which each vessel placed its main reliance upon the action of the other instead of its own to avoid collision, and each waited in vain for the other to alter its course. See No. 2, 60 F.2d 733, 734 (2 Cir. 1932). Each vessel having been at fault, and the fault of each having been a proximate cause of the collision, the vessels must divide the damages equally. The North Star, 106 U.S. 17, 20, 1 S.Ct. 41, 27 L.Ed. 91 (1882).

The foregoing opinion shall constitute the findings of fact and conclusions of law of the Court.

Settle decrees accordingly.

---

60. Compare 33 U.S.C. § 203 (port-to-port passing required "where vessels are meeting end on or nearly end on, *in such a manner as to involve risk of colli-*

*sion"*) (Emphasis added) and note 58 supra.

61. Tr. pp. 304–05.